```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION

_____ )
                                       )
HOLLEY JONES                           )
                                       )
          Plaintiff                    )
                                       )
Vs.                                    ) Case No.:  2:19-CV-114-JLB-NPM
                                       )
JAMES BARLOW and CHRIS ROBLES          )
                                       )
          Defendants.                  )
_____ )
```

**ZOOM VIDEOCONFERENCE**
**MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE JOHN L. BADALAMENTI**

**June 10, 2021**
**2:01 p.m.**

**APPEARANCES:**

| | |
|---|---|
| **FOR THE PLAINTIFF:** <br> **(Via Zoom)** | ROOK ELIZABETH RINGER, ESQUIRE <br> Lento Law Group, P.A. <br> 222 San Marco Avenue, Suite 222 <br> Tampa, Florida  32084 |
| **FOR THE DEFENDANT:** <br> **(Via Zoom)** | ROBERT BARRY BURANDT, ESQUIRE <br> Burnadt, Adamski & Feichthaler, PL <br> 1714 Cape Coral Parkway East <br> Cape Coral, Florida  33904 |
| **COURT REPORTER:** <br> **(Via Zoom)** | Stacey E. Raikes, RMR, CRR <br> 2110 First Street, Room 2-194 <br> Fort Myers, Florida  33901 |

(Proceedings recorded by stenographer and transcript produced by computer-aided transcription.)

```
1                         P R O C E E D I N G S

2              THE COURT:  On the record now in Jones v. Barlow and

3    Robles, 19-cv-114.

4              If counsel would kindly state their appearances?

5              MS. RINGER:  Hi.  This is Rook Ringer for the

6    plaintiff, Holley Jones.

7              THE COURT:  Thank you.

8              MR. BURANDT:  Robert Burandt for the defendants.

9              THE COURT:  All right.  Mr. Burandt, Ms. Ringer, all

10   right.

11             All right then.  I appreciate making yourself

12   available for this hearing.  There are some questions I have

13   here.  So let's go ahead and just go over some just quick

14   housekeeping matters first.

15             We're currently set for the August trial term.  We

16   have deadlines for the motions in limine as July 12th and we

17   have a joint final pretrial statement for July 15th.

18             Ms. Ringer, is this -- how many days to present your

19   case-in-chief?

20             MS. RINGER:  At this point, Your Honor, I'm not 100

21   percent sure.  It would at least be a few -- few days with the,

22   you know, defendants', you know, testimony and whatnot.

23             THE COURT:  Well, how many witnesses do you have?

24   Let's start with that.

25             MS. RINGER:  That I was not prepared for today, Your
```

1    Honor.

2          THE COURT:  Do you -- okay.

3          MS. RINGER:  I'm hoping, Your Honor -- I apologize.

4    I'm hoping to get some assistance from another

5    attorney for trial just because I have not ever tried a federal

6    case before in trial.  So I'm working on that at the moment.

7          THE COURT:  Mr. Burandt, how many days would the

8    defendants need?

9          MR. BURANDT:  I don't believe we'd need any

10   additional time.  I'm guessing two days for the whole trial.

11   Maybe two-and-a-half, three days at the most.  I don't see that

12   many witnesses.  I'm guessing, for the plaintiff, maybe four or

13   five witnesses, and those witnesses may include the two

14   officers, so call it six, seven witnesses.

15         THE COURT:  Okay.  Are both officers currently

16   located still down in the -- in our area, Fort Myers?

17         MR. BURANDT:  Yes, sir, they're both still employed

18   by the Fort Myers Police Department.  At least last time I

19   checked.

20         THE COURT:  Okay.  Are you aware of any other

21   witnesses, Mr. Burandt, and where their location may be?

22         MR. BURANDT:  No, I'm going to assume the plaintiff

23   is going to testify and I'm going to assume the court -- the

24   clerk in the court will testify.  I'm going to assume they're

25   going to have somebody from the Fort Myers Police Department,

```
 1    maybe the chief, maybe the captain or major, and then I'm going

 2    to assume the two witnesses.

 3              THE COURT:  Okay.  You meant the clerk of the

 4    7-Eleven; right?

 5              MR. BURANDT:  Yes, what did I say?  I'm sorry.  I

 6    meant the clerk of the 7-Eleven.

 7              THE COURT:  Yeah, I was afraid you were going --

 8    someone was going to subpoena the clerk of our court.

 9              MR. BURANDT:  Oh, no, I meant the 7-Eleven clerk.

10    And I don't believe there's any medical testimony.

11              THE COURT:  No, no, there's not.

12              MR. BURANDT:  Thank you.

13              THE COURT:  I couldn't imagine there being, but then

14    again, I don't know.

15              So, basically, just from the plaintiff's standpoint,

16    you're not trial ready?

17              MS. RINGER:  No, Your Honor.

18              THE COURT:  Okay.  All right then.  So here's what

19    we're going to do:

20              We're going to -- I will be issuing an order after

21    this hearing moving the trial to the September calendar.  I'll

22    reset the deadlines for motions in limine, the final pretrial

23    conference, joint final pretrial statement.  We will go ahead

24    and estimate that the trial will last between two-and-a-half

25    and three days.  There's a jury demand on this one, and it's my
```

1    understanding from our last meeting, Mr. Burandt, that the

2    defendant would not waive jury in this one?

3              MR. BURANDT:  Correct.

4              THE COURT:  Okay.  Very good then.

5              So what I'll do is I'll enter an order moving it in

6    light of plaintiff not being prepared for trial in this case.

7              MR. BURANDT:  Well, Judge, I think we're jumping a

8    step here.  We have this Motion for Summary Judgment based on

9    qualified immunity.

10             THE COURT:  Oh, yeah, that's right.

11             MR. BURANDT:  If you grant that motion, then we don't

12   have to worry about a trial.

13             THE COURT:  Well, it's going to depend on your

14   performance today.

15             MR. BURANDT:  Ah, make it difficult, huh?

16             THE COURT:  Not difficult.  I kind of telegraphed

17   where I was going with these questions.  So let's go ahead and

18   start with this premise:  We're going to start with the premise

19   from this argument that I'm rejecting any argument that

20   probable cause existed.  It's my opinion none existed based on

21   an anonymous tip that was provided.  It's one of those

22   circumstances where we find ourselves where we are aware of

23   the -- what happened based on the video and the body cam.

24             So my questions are shifting back down towards

25   reasonable suspicion, which relates to whether or not Officer

1    Robles, upon arriving at the scene, based with the information

2    that was provided in the 911 call, had reasonable suspicion to

3    conduct an investigatory stop of Mr. Jones inside of the

4    7-Eleven and we're going to start with that premise.  There's

5    really not much, I don't think, you're going to be able to do

6    to convince me about there being probable cause here.

7           That said, Mr. Burandt, you can swing all you want at

8    that one and maybe you'll be able to convince me.

9           MR. BURANDT:  Okay.  Now, again -- I'm sorry.

10          THE COURT:  And so where I am right now is, as I've

11   set forth in that order, just many questions have kind of been

12   driven here with there's no separation between the officers'

13   individual liabilities here considering that one officer was

14   there for about a minute-and-a-half or so before Officer Barlow

15   came.  So Officer Robles was there and he responded to the

16   call.  Then, 90 seconds later, Officer Barlow came in.  And I

17   would like to hear argument here from counsel for the

18   defendants here giving your overview argument as to, certainly,

19   qualified immunity and then I'll ask specific questions once I

20   understand the direction that you're going.

21          So you can proceed when you'd like to, Mr. Burandt.

22          MR. BURANDT:  Okay.  Thank you, Your Honor.

23          Well, first of all, Judge, one of the things you have

24   to keep in mind here is that we're evaluating the circumstances

25   through the eyes of a police officer, not through the eyes of a

1     bystander.  No disrespect, but I was a police officer for 11

2     years and I worked on the road and there are certain things you

3     see and do in response to how people react to you.  And

4     sometimes that can't be specifically articulated, but you just

5     know something's not right.

6           For example, they knew something was wrong with the

7     plaintiff in this case.  They didn't know what it was, but they

8     knew something was up.  And, when we took his deposition, we

9     found out that he was, in fact, holding heroin and he had, in

10    fact, smoked marijuana earlier in the day.  His behavior was

11    erratic, it wasn't normal, so when they first --

12          THE COURT:  So my question is is like -- even your

13    launching point makes it really difficult for me to understand.

14    You know, and if we were to take this part of the transcript

15    and pull it out, it would result in, if I were to agree with

16    you, a reversal immediately from the Eleventh Circuit because

17    you're trying to suggest that there's just something you know;

18    right?  You just feel it, but you can't articulate it.  But

19    that's the entire standard of reasonable suspicion, is that you

20    have to articulate it.

21          MR. BURANDT:  But, again --

22          THE COURT:  Not what -- it's not an ends justifies

23    the means in that we found out after the fact that he smoked

24    marijuana, we found out after the fact, after we seized him,

25    that he had drugs on him.  So would you like to start over?

1          MR. BURANDT:  No, I believe that what I said was this

2     has to be viewed through the officers' eyes, not through Monday

3     night quarterbacking.  They knew something was wrong.  They

4     knew --

5          THE COURT:  Right.

6          MR. BURANDT:  -- that his behavior --

7          THE COURT:  But this is an objective standard, not

8     through his eyes.  It's not subjective.  Are you arguing this

9     is subjective?

10         MR. BURANDT:  I think it's through the eyes of a

11    reasonable police officer.  So it's a little bit of both.  It's

12    not clearly subjective or objective, but I'm just saying that

13    they've articulated that in their depositions and they said

14    something was wrong.

15         You don't reach out to shake a police officer's hand

16    when a police officer first arrives on the scene.  You might

17    reach out and shake his hand when the event's over, but one of

18    the first things they teach you at the academy is keep your

19    distance.  This guy could be reaching for your hand and then

20    grab your gun.  And these guys aren't the most experienced

21    officers, I'll concede that.  They're younger officers and they

22    went in there.  They had an anonymous call.  And I think we

23    cited the *Navarette v. California* case where the tipster called

24    911 soon after she had been run off the road by the driver who

25    was driving dangerously.  The Supreme Court noted that sort of

1  contemporaneous report has long been treated as especially

2  reliable.  The Court also determined that another indicator of

3  veracity is the caller's use of the 911 emergency system.

4          THE COURT:  Was the caller in *Navarette* anonymous

5  like here?

6          MR. BURANDT:  Yes.

7          THE COURT:  Okay.  And even though she was run off

8  the road?

9          MR. BURANDT:  Yes.  She ran -- she called 911 and

10  reported the incident.

11          THE COURT:  Okay.  Proceed with your argument.

12          MR. BURANDT:  If you go back -- if you go on to the

13  Eleventh Circuit, in 2020 in the *United States v. Bruce*, 977

14  F.3d 1112, the Eleventh Circuit has held that an anonymous 911

15  call giving eyewitness details of a realtime event is reliable

16  enough to credit the caller's account.  In *Bruce*, the police

17  received an anonymous 911 call about two men arguing next to a

18  white car.  The caller reported that one of the men was armed.

19  Officers arrived on the scene minutes later and they stopped

20  two men in a car matching the caller's description.  One of the

21  suspects fled, but was quickly apprehended and charged with

22  possessing an illegal firearm.  The arrested subject moved to

23  suppress evidence of the gun arguing, among other things, that

24  the officer did not have reasonable basis to begin the stop

25  because originated from an anonymous 911 call.

1          THE COURT:  So it was anonymous.  We'll go ahead and

2     we'll say we have -- let's just presuppose, without deciding

3     that, this is as an anonymous call is -- we definitely had one

4     here.  We had one there.

5          Let's talk about why the anonymous call was reliable.

6     Tell me what was in the context of the call, in terms of

7     description, that an objectively reasonable officer would have

8     used that information in the call to identify Mr. Jones so as

9     to conduct a permissible *Terry* stop.  Because that goes to the

10    reliable -- that goes to reliability of the tip.  Tell me the

11    description of the person.

12         MR. BURANDT:  That the witness identified the suspect

13    as a black male, late 20s, thin build with black shirt and

14    green pants.  Jones fit the description sufficiently for

15    Officer Robles to believe he was the person identified in the

16    911 call.

17         THE COURT:  What does sufficient mean?  What was it

18    other than him being black?

19         MR. BURANDT:  I think the way he was dressed, the way

20    he was acting.

21         THE COURT:  Because he wasn't --

22         MR. BURANDT:  The caller also said that he was

23    approaching people at the pump, the gas pump; so...

24         THE COURT:  Was he approaching anyone at the -- was

25    he standing at the counter when the officer came in?

 1          MR. BURANDT:  No, I think he was outside when they

 2    arrived, but I can't be positive.

 3          THE COURT:  No, no, he was inside.  He was inside.

 4    There was a person nearly matching that entire description

 5    standing to the left of Officer Robles when he walked in

 6    walking in a circle in a parking spot.  That was a black male

 7    that was skinny that was -- that looks to be in his late 20s,

 8    and Officer Robles passed that person who was standing in the

 9    parking lot right by the spot that would be closest to the

10    front glass of the 7-Eleven kind of meandering in a circle.

11    The officer passed that person and went inside.

12          MR. BURANDT:  The whole point of qualified immunity,

13    Your Honor, is to protect officers even when they're wrong, and

14    the case law clearly says that a reasonable but mistaken belief

15    that probable cause exists for using significant force is not

16    actionable under 1983.  So just because his suspicion may have

17    been wrong or incorrect does not remove the shield of qualified

18    immunity.

19          THE COURT:  All right, so --

20          MR. BURANDT:  So I don't know who was standing there.

21    I don't remember this person, but I haven't seen the video in a

22    while.  Probably over a year now.

23          THE COURT:  Counsel, Counsel, are you -- listen, I've

24    been a judge for six years, okay?  I've had hundreds and

25    hundreds of oral arguments.  You mean to tell me, preparing for

1     this hearing, you didn't watch the video?

2           MR. BURANDT:  Did not.  I watched it a while back.

3           THE COURT:  Are you sure -- are you prepared for

4     trial?

5           MR. BURANDT:  Yes, I'm prepared.  I'm willing to go

6     to trial.  It sounds like you've already made up your mind,

7     Your Honor; so...

8           THE COURT:  I have not.  I have not made up my mind

9     because I need to understand the difference between the two

10    officers' conduct here and whether or not qualified immunity

11    may or may not attach to one.  Does it attach to Robles but not

12    Barlow or Barlow without Robles?  That is one question I had

13    here that I'm just trying to understand the reliability of it.

14          You had said rotely, like the briefing, that he

15    matched the description.  So we match the description by saying

16    the individual looked -- was black.  He wasn't wearing green

17    pants.  He was wearing shorts, okay?  There was a black shirt,

18    just like the person standing outside.  So the question becomes

19    then was the tip reliable at that point in time.

20          MR. BURANDT:  I disagree.  It's not whether the tip

21    was reliable.  The tip was reliable because it was made through

22    an emergency call system, which people normally give great

23    credence to when somebody comes in on a 911 call.  Everybody

24    knows that those 911 calls are monitored and, presumably, can

25    be traced.  So the fact that it was a 911 call and not just a

1    regular call into the police station, the fact that they gave a

2    description, I think the call was reliable.  I think and I

3    assume the Court thinks that somebody was out there doing what

4    this person saw and this person was concerned enough to make a

5    911 call.  So I think the call was reliable.

6         Now, whether or not there's suspicion that this was

7    the guy or not the guy, that may have been unreliable.  That's

8    what you're saying, I think.  But I think the call was

9    reliable.  They responded.  The police have to respond when

10   they get calls, whether they're anonymous or non-anonymous.  So

11   the dispatcher thought it was reliable enough to send officers

12   to the scene.  So I think the call is reliable.  I think the

13   Courts have said in the past that the 911 calls are reliable.

14        Now, when you get there, do they put the square peg

15   in the round hole?  Does this guy not fit?  I can't second

16   guess these officers.  They listened to the 911 call.  They

17   showed up on the place they were supposed to be at.  They were

18   at the right place at the right time.  They saw this individual

19   who, in their mind, fit this description.  So they just simply

20   tried to do a *Terry* stop.  They weren't arresting this guy.

21   They just had enough suspicion to stop and ask this guy who he

22   was.  At that point, this guy starts acting a little unusual

23   based on their experience.  So they ask him to step outside.

24        I don't know what else you would do in that situation

25   as a police officer.  Would you just walk away when you got

1    this guy in the store that's acting erratically and you had a

2    previous call?  You end up getting sued by somebody that got

3    hurt by this guy in the store.  So they asked the guy to step

4    outside.  He steps outside, they have a brief conversation, and

5    then he bow -- he runs inside and, as he's entering the door,

6    he bows up and he runs inside.  I think that -- go ahead.

7              THE COURT:  When was he seized?

8              MR. BURANDT:  I'm sorry, when was what?

9              THE COURT:  When was Mr. Jones seized?

10             MR. BURANDT:  You know, the plaintiff's going to

11   argue that he was seized the moment he stepped outside.  I

12   think he was seized the moment he broke away from outside and

13   went inside.

14             THE COURT:  Would a reasonable officer that's been

15   dispatched from a 911 call with a particular description simply

16   ask someone inside of a store, who's not exhibiting any

17   behavior other than trying to pay for something, explain to the

18   person why they're being asked to step outside?  Would a

19   reasonable officer inform a suspect -- let's just say he's a

20   suspect -- why they're being asked to go outside?

21             MR. BURANDT:  I believe there was an explanation

22   given as to why they were going outside.  To clear this up or

23   to talk to him for everybody's safety.  I don't see any problem

24   with -- once you have reasonable suspicion to make the *Terry*

25   stop, I don't see any problem with moving to a safer location

1    for both yourself as a police officer and as the suspect.

2              THE COURT:  All right.

3              MR. BURANDT:  I don't think that's an issue.  And, at

4    that point, they were asking him to step outside.  And,

5    initially, he complied.  Then he runs back in the store.

6              So I had a list of questions --

7              THE COURT:  Would it make a difference, in your mind,

8    if Officer Robles did not advise Mr. Holley Jones here, would

9    it make a difference to you if the officer did not tell him why

10   he was asking him to stand outside?

11             MR. BURANDT:  In this case, I think it would make a

12   difference.  I mean, it may make a difference.  I wasn't there,

13   Your Honor.  I can't -- I can't tell you what was surrounding

14   me.  I can't tell you what my thoughts -- what their thoughts

15   were at that particular moment.  I do, as a matter of routine,

16   I do believe you ought to tell people, I'm big on

17   communications, excuse me, sir, we had this anonymous call.

18             THE COURT:  Uh-huh.

19             MR. BURANDT:  We'd like to talk to you.  Normally, I

20   would agree with you.

21             THE COURT:  I definitely --

22             MR. BURANDT:  But I wasn't there.

23             THE COURT:  I agree with you on that.  That's

24   probably best practices.  And, you know, if you were training

25   new officers, you would, you know, suggest communication is

1    important; correct?

2            MR. BURANDT:  Absolutely.  No doubt about it.

3            THE COURT:  Okay.

4            MR. BURANDT:  But I wasn't there so I don't know, you

5    know, who else was 20 feet, 30 feet away.  I don't know what

6    was happening outside.  I only can say that I think these

7    officers acted within the realm of reasonableness.

8            Now, was it perfect?  No, obviously, nothing is ever

9    perfect, but that's why qualified immunity is there, is to

10   protect officers from the imperfect world.

11           So I think they had enough to stop him and question

12   him based on the anonymous call, based on his -- the suspicious

13   or peculiar behavior.  And, you're right, it really shouldn't

14   matter what happens after the fact, that he had the -- and I

15   didn't mean that was a way of altering the summary judgment.

16   I'm just saying that -- I'm trying to establish why they

17   thought what they thought after the fact, which is probably

18   improper, but I think they had reason enough to stop him and

19   ask him to step outside.

20           THE COURT:  And the officer suggested in his

21   testimony that it was weird that someone was overly friendly,

22   as this defendant was.  That was one thing that was testified

23   to.

24           MR. BURANDT:  Are you asking that of me or --

25           THE COURT:  No, I'm just trying to go through my

```
 1    notes here --

 2              MR. BURANDT:  Yeah.

 3              THE COURT:  -- to see if anything I said evoked a

 4    response of some sort from you.

 5              MR. BURANDT:  I can tell you with 100 -- almost 100

 6    percent surety that no police officer arriving on a scene at

 7    the initial onset is going to shake anybody's hand or come into

 8    that close because that's the first thing they teach you at the

 9    police academy is stay back, stay away, don't let them get your

10    hand, don't let them get your gun, and this guy was -- that

11    itself is a peculiar -- and in 11 years of me on the job, I

12    never had anybody do that.  So, to me, that was very peculiar.

13    That would -- that would enhance my senses to believe something

14    isn't right here.  And it turns out he was high.  That's -- and

15    I'm sorry they misinterpreted that signal, but he could have

16    just as been mentally ill.  And these officers lost an officer

17    a short time later almost on the identical circumstances.  The

18    guy ended up getting the cop's gun and shooting him.

19              THE COURT:  I understand.

20              MR. BURANDT:  Do you want me to address the next

21    question?

22              THE COURT:  I do.

23              MR. BURANDT:  Okay.  You asked if Officer Robles was

24    protected by qualified immunity if question number one is no.

25              THE COURT:  Uh-huh.
```

1          MR. BURANDT:  If he had no reasonable suspicion, Your

2     Honor, I would be inclined to agree with you, but I think we're

3     boiling this down to he had to be 100 percent correct.

4          THE COURT:  What does that mean?

5          MR. BURANDT:  Well, I think where I'm getting the

6     sense that you're going is that these officers had to be 100

7     percent correct that he wasn't the right guy, he wasn't the

8     right person, and we're questioning their judgment on the fact

9     that reasonable suspicion.  You know, that's a -- that's -- you

10    know, officers stop people all the time, not detain them, but I

11    think you're okay to stop and talk to somebody.  Are we going

12    to establish a society where police officers have to look the

13    other way if they see somebody walking down the street at a

14    strange hour of the night or --

15         THE COURT:  No, no, no, those aren't the facts here.

16    Those are definitely not the facts here.  And we have some

17    someone in a place where -- inside of a store partially to the

18    extent that the person is black.  He's heavier set, that's for

19    sure.  That is, as I'm seeing it, a partial match of the

20    description.  I'm not suggesting there needs to be an identical

21    match, okay?  We have a store clerk saying, "He didn't do

22    anything.  Why don't you tell him why you're here," from behind

23    the counter.  And it just seemed that the person that was the

24    calmest in this fact pattern was Mr. Jones.  For whatever

25    reason, he was calmer for sure.

```
 1              So are you firm that there -- that this -- the
 2    initial stop of Mr. Jones, what was it supported by?  Was it
 3    supported by a reasonable suspicion?  Was it supported by
 4    probable cause?  What is your position?
 5              MR. BURANDT:  Well, obviously, there was no probable
 6    cause because they couldn't have made an arrest based on what
 7    they had.  So I think they had reasonable suspicion based on
 8    the 911 call, based on the proximity, because when people call,
 9    everybody knows that eyewitnesses are the worst, so based on
10    what they had, that limited amount they had, they chose him to
11    stop and question him.
12              Then he began acting peculiar.  Before they detained
13    him, he began acting peculiar.  We now know why, but, of
14    course, the officers didn't know that at the time.  He started
15    acting peculiar.  Those are the three things that gave
16    justification to do the *Terry* stop and make a further inquiry.
17    They asked him his --
18              THE COURT:  The peculiarity was shaking hands?
19    Attempting to shake a hand?
20              MR. BURANDT:  It's attempts to reach out.  Put his
21    hands on the officer, near the officer.  The fact of the way he
22    was talking, the way he acted, the whole -- the whole
23    experience, I guess, lack of a better term.  And maybe the
24    officers didn't define that clearly enough, but I think they
25    had enough at that point.  They had a reasonable suspicion that
```

1        this guy was doing something he shouldn't have been doing.

2                Again, we now know what he was doing, why he was

3        there, but the officers didn't know that at the time.  But they

4        did have the 911 call.  They wouldn't have been there but for

5        the 911 call.  They wouldn't have been there but for the

6        dispatcher sending them there on this 911 call.

7                Let me answer your other question about you asked me

8        if it would have been known.  Now, obviously, the Eleventh

9        Circuit has long held that it's unlawful to seize a suspect

10       without legal justification.  Nobody's going to argue against

11       that.  But it is not enough for Jones to simply point at this

12       general rule and claim a violation of his rights and there's

13       case law to support that.  They have to show that they violated

14       some clearly established law as opposed to just generally

15       violated the reasonable suspicion.  So the burden is not on the

16       defendants at this point.  The burden is on the plaintiff to

17       show that there was some clearly established law or policy that

18       was violated.

19               Now, there's a case, a relatively new case, out of

20       the Eleventh Circuit that talks about the police responding --

21       because I know this is your other question -- the police

22       respond to a domestic violence case.  The man runs out of the

23       house with a rifle.  He hears the police come.  He climbs a

24       tree.  He leaves the gun at the base of the tree.  He climbs up

25       in the tree.  The police, upon arrival, they've got a dog.  He

1    hears the dog coming so he tells the police that he's up in the

2    tree.  They tell him to put his hands up, climb down from the

3    tree.  He says you want me to put my hands up or you want me to

4    climb down?  And they say put your hands up.  He then gets

5    worried about the gun down below and he says oh, by the way,

6    there's a gun down there.  One of the officers yells out he has

7    a gun, another officer tasers him, and he falls out of the

8    tree.  The Eleventh Circuit found that they were justified in

9    tasering him.  They were justified.  They had reasonable

10   suspicion.

11        THE COURT:  Counsel, it would help the Court if you

12   identified the case that you're talking about --

13        MR. BURANDT:  I was just going to tell you.

14        THE COURT:  -- and give the citation as a lead-in to

15   discussing the case.

16        MR. BURANDT:  Sure.  It's *Harper v. Davis*.

17        THE COURT:  Okay.  And the cite?

18        MR. BURANDT:  Let's see.  The cite is 571 F.App'x at

19   906.  It's a 2014 case out of the Eleventh Circuit.

20        THE COURT:  Is *Harper* cited in your brief?

21        MR. BURANDT:  I just found that case this afternoon,

22   Your Honor, so I'm not sure.  I didn't write the -- I'm just

23   filling in for Tim Culhane, who was the -- is really on this

24   case and wrote that Motion for Summary Judgment.  So I don't

25   know if he cited it or not, but it's a great case.  It's right

1      on point with this case.

2                 THE COURT:  Okay.  If you would provide me a quick

3      opportunity to pull that case up?

4                 MR. BURANDT:  You want me to -- I'm sorry, are you

5      asking me?

6                 THE COURT:  Just if you would pause your argument for

7      a moment.

8                 MR. BURANDT:  Oh, sure.

9                 THE COURT:  Because I'd like to read that case

10     quickly.

11                (Pause.)

12                THE COURT:  All right.  I've read the case, Counsel.

13     Thank you for that opportunity.  I just think that it's

14     difficult to discern that this case is akin to someone sitting

15     in a tree with a rifle here, but I appreciate the citation to

16     the case.

17                What we're going to do is we'll switch to Ms. Ringer

18     here and let's talk a little bit about the clearly -- what is

19     the clearly established constitutional violation here.  My

20     suggestion at the beginning of this was the clearly established

21     constitutional right here.  It could be suggested to be just a

22     violation of one's right to be free of unreasonable seizure.

23     In other words, did we -- did the officers, based on the 911

24     call and what they observed upon arriving at the 7-Eleven, did

25     that constitute a permissible *Terry* stop.  So we'll start with

1   what you think the clearly established right that has been

2   violated here.

3            MS. RINGER:  Well, Your Honor, am I going to be able

4   to address the reasonable suspicion thing in section one?

5            THE COURT:  If you would like to start there, that is

6   perfectly fine as well.

7            MS. RINGER:  Yes, I would, Your Honor.

8            First off, I wanted to note that some of what

9   Mr. Burandt brought up earlier about hunches and whatnot, it

10  does specifically state in -- the Eleventh Circuit in *United*

11  *States v. Powell* says that reasonable suspicion exists if, "A

12  police officer has a reasonable articulable suspicion based on

13  objective facts that the person is engaged in or is about to

14  engage in criminal activity."  And then, in *Illinois v.*

15  *Wardlow*, the United States Supreme Court stated that the

16  officer, "Must be able to articulate more than an inchoate and

17  unparticularized hunch of criminal activity."  So I think that

18  pretty clearly shows that that's not good enough --

19           THE COURT:  Right.

20           MS. RINGER:  -- that they thought maybe there was

21  something going on.

22           In addition, when it comes to the anonymous tips,

23  *Florida v. J.L.*, a 2000 Supreme Court case that was cited in

24  the response to the Motion for Summary Judgment, was a

25  unanimous United States Supreme Court decision which held that

1    an uncorroborated, anonymous tip, even one that a person was

2    carrying a gun, does not provide police officer with reasonable

3    suspicion to stop and frisk that person until they've

4    corroborated some aspect of it.  So the presence -- and they

5    quote, "The presence of an individual, even one matching the

6    physical description given by the anonymous tip in the area

7    indicated by the tip, is insufficient standing alone to

8    establish reasonable suspicion."

9           THE COURT:  Right.

10          MS. RINGER:  So I don't -- I don't see -- he

11   doesn't -- the only thing that matches, really, is that he's

12   black and he's wearing a black shirt.  Well, if the anonymous

13   tip said there was a white guy in a black shirt and they just

14   went and got the first white guy they found in a black shirt, I

15   don't think that's reasonable suspicion.  Yeah, and they didn't

16   really corroborate anything.  If anything, the, you know, the

17   clerk of the convenience store is not corroborating.  She's

18   saying it's not him or he didn't do anything.

19          THE COURT:  What about addressing the *Navarette* case

20   *v. California*, which was a 911 call of a report of disorderly

21   intoxication and it went to the reliability of that call based

22   on the caller's personal observations?

23          MS. RINGER:  Well, you know, there are multiple cases

24   that show that the -- that an anonymous call is a weaker case

25   than an informant known to the police or anything else like

1    that, but it says there must be something, some additional

2    factor, you know --

3               THE COURT:  Right.

4               MS. RINGER:  -- than just an anonymous tip.

5    Especially here.

6               THE COURT:  Right.  So the 911 call there, the 911

7    call in *Navarette*, as counsel did state, was a call by an

8    individual that was ran off the road and that was a dangerous

9    sort of situation there.  The Supreme Court said that

10   reasonable suspicion stands on the factual and practical

11   considerations of everyday life on which reasonable and prudent

12   men, not legal technicians act, and that is what counsel for

13   these police officers are saying here, is that we don't have

14   all these opportunities to, you know, parse legal case law in

15   the field where you don't know who's standing around the

16   officer 20 feet away and sorts of matters like that.  We have

17   to provide officers in range of reasonable choices in the

18   ability for them to do their jobs, which was, here, which was

19   responding to an anonymous tip from a 911 call.  So the -- I

20   guess what we're doing is we have to understand what clearly

21   established right was violated by these officers and that's

22   really what I'm honing in on here, Counsel.  If you could help

23   me understand that.

24               MS. RINGER:  Well, Your Honor, I did look up another

25   case in preparation for this hearing with respect to the

1    deployment of the Taser, and that was *Watkins v. Mobley*, which

2    is a Southern District of Florida case from 2017.  It's an

3    unpublished case, but it does deal with a somewhat similar

4    case.  And they state that quote --

5            THE COURT:  What's the citation, please?

6            MS. RINGER:  I'm sorry.  The citation is 2017 WL

7    6558369.

8            THE COURT:  Thank you.  Proceed.

9            MS. RINGER:  And, in that case, the officer was at a

10   club and they noticed the guy drinking.  The officer, you know,

11   took him outside and trespassed him from the club.  He came

12   back later so they knew he'd been -- they knew he was

13   intoxicated and they knew that he was committing trespass at

14   this point.  So they had way more suspicion than in this case

15   where they don't have any reason to believe that this guy's

16   done anything.  And they said in that police officers may

17   deploy their Tasers when necessary to secure a suspect whom

18   they reasonably perceive as threatening.  Well, Your Honor, I

19   don't -- I mean, the officer said he was overly friendly and he

20   pulled out his Taser at that point, according to the Motion for

21   Summary Judgment, and that was, I guess, Robles that first

22   pulls out the Taser and then he eventually put it back, but I

23   would argue the second he pulls out the Taser, really, he's

24   effected a seizure.  But they also quote to an Eleventh Circuit

25   case in that case, *Hadley v. Gutierrez*, from 2008 where they're

1    saying that it's gratuitous use of force when a criminal

2    suspect is not resisting arrest or gratuitous use of force when

3    a criminal suspect is not resisting arrest constitutes

4    excessive force.

5            Here, and just like they did mention, in this case

6    that I'm citing here, *Watkins v. Mobley,* they denied summary

7    judgment with respect to excessive force and the use of the

8    Taser because he -- one of the reasons being that they didn't

9    warn him that he was going to get -- that he was going to use

10   the Taser.  And, you know, so they felt that there was a

11   sufficient sort of -- there was sufficient evidence in the

12   record to create an issue for trial as to whether the use of

13   the Taser was gratuitous or whether they should be granted, you

14   know, qualified immunity summary judgment.  But, this also

15   mentions, even if you look at their version as true, the deputy

16   in there was investigating a misdemeanor and was not posing a

17   threat to the officers or the public nor was he resisting

18   arrest.

19           Similarly, here, I mean, he's at the -- he goes back

20   inside and he's asking for help from the clerk.  And I believe

21   it was -- not Robles, but the other one -- Barlow that uses the

22   Taser.  And he doesn't say he's going to use the Taser, he

23   doesn't give any kind of warning, he just shoots him with it

24   and --

25           THE COURT:  So here's my question.  I'll just try to

1    like crystalize it the easiest I can here.

2         And I know that -- now I'm looking at the briefing --

3    you did not brief this particular -- the summary judgment,

4    Counsel?  Did you write this brief on the summary judgment, in

5    opposition to summary judgment?

6         MS. RINGER:  No, Your Honor.  If you remember, that

7    was --

8         THE COURT:  You joined in after Mr. Jones dismissed

9    previous counsel?

10        MS. RINGER:  Well, I was on the case, Your Honor, but

11   I didn't participate in that briefing.

12        THE COURT:  Okay.  So let's assume one minute that

13   the *Terry* stop may have been illegal.  We'll just keep it

14   simple there.  Then what is Mr. Jones relying on for our

15   clearly established law?  And that's really -- in other words,

16   is there a factually similar case here so that it's not just an

17   established law of, say, an illegal search and seizure, but

18   it's clear that these facts line up such that reasonable

19   officers would have clearly known that proceeding forth with

20   that seizure, if you will, or detention, if you will, violated

21   something that is, you know, the old concept of, you know,

22   hornbook law.  And that's kind of where I'm going with that, is

23   the ability to identify that case something for me?

24        MS. RINGER:  Your Honor, like I said, in *Watkins v.*

25   *Mobley,* I know it is unpublished, but it was fairly recent case

1    in the Southern District and it did involve a Taser and I think

2    some of the similarities in that case are pretty much on point

3    to this case.  And they also -- they're citing to the Eleventh

4    Circuit and *Hadley v. Guttierez*, 526 F.3d 1324, you know, to

5    say that any kind of gratuitous use of force, when the person

6    is not resisting arrest, constitutes excessive force.  And,

7    clearly, this Court is considering the use of a Taser, at the

8    very least, to be worth a jury determination as to whether that

9    constitutes excessive force.  I think it's pretty obvious, but,

10   you know, that's why we have summary judgment hearings, Your

11   Honor.  It's to determine whether a material fact exists, not,

12   you know, 100 percent.

13            THE COURT:  So I am seeing it, really, two ways now.

14   And I don't know if you're arguing these in the alternative or

15   not.

16            Are we relying on the lack of there being a

17   reasonable suspicion as the clearly established right that was

18   violated or are we relying on the egregiousness of the

19   officers' conduct here?  And, if so, what particularly?

20            MS. RINGER:  Well, Your Honor, like I said, I think

21   you can argue both.  There was no, as I pointed out earlier, we

22   didn't go into it in too much depth because I think Your Honor

23   understand the basics of the reasonable suspicion issue, but I

24   don't believe that there was any kind of, you know, credible

25   reason to even conduct a *Terry* stop of Holley Jones at this

1    point.  And, within seconds of him talking to Officer Robles,

2    he's pulled out his Taser and he's saying -- he's yelling at

3    him to go outside.  I don't think he --

4            THE COURT:  Yeah, I didn't see pulling out his Taser

5    there at all.

6            MS. RINGER:  That's in their Motion for Summary

7    Judgment.

8            THE COURT:  Uh-huh.

9            MS. RINGER:  It says that right after Holley Jones

10   attempts to shake his hand, the next thing that the defendants

11   say is that Officer Robles then put his -- re-holstered his

12   Taser.

13           THE COURT:  Okay.

14           MS. RINGER:  So, I mean --

15           THE COURT:  One of the -- I'll go back and look at

16   that part of the video and any testimony that relates to it.

17           So this is where this case is somewhat unique and it

18   has to do with, let's say, for example, we determine -- I

19   determine that there is not reasonable suspicion here and it

20   was blatantly -- it was clearly established here that an

21   individual that partially matched located in the different --

22   inside a store as opposed to outside, not matching the

23   description, only to the extent it's a black individual with a

24   black shirt, not the -- wearing shorts and the build is

25   questionable, we'll say that there isn't reasonable suspicion.

```
 1    There seems to be this flurry of cases that are developing that
 2    I'm having a difficult time swallowing.  It started with this
 3    premise of we -- and I do agree that we need to protect
 4    officers and that's what qualified immunity is about.  It's
 5    that, listen, you know, they're not going to be sitting there
 6    with Westlaw open with, you know, hours upon hours and cups of
 7    coffee like lawyers have in drafting a brief on summary
 8    judgment to know whether or not something that they're doing
 9    is -- was found to be illegal in an unpublished decision in the
10    Southern District of Florida.  It's about these blatant
11    violations; right?  It's about, like, no reasonable officer
12    knowing and having the information of the tip and arriving on
13    the scene would have done what this officer did or these
14    officers did.
15          So we talked about it in the context of a false
16    arrest originally.  And, basically, saying that he may not have
17    had probable cause that someone committed a crime, right, or
18    was in the commission of a crime, but there's arguable probable
19    cause; right?  So this concept of arguable probable cause came
20    out and some of that is argued.
21          Then there is an even slither more of cases that take
22    that premise and say officers are nonetheless permitted to have
23    qualified immunity if there is arguable reasonable suspicion,
24    which, to me, is, you know, law school we know that in order
25    for a -- something to be a reasonable suspicion, it must be
```

1    backed with, you know, clearly articulable facts.

2            So then we say what's less than reasonable suspicion

3    in law school?  Well, you know, can't be a hunch.  It can't be

4    well I just kind of know.  You feel it, you smell it, you've

5    seen it, I've been a cop and I know that you're standing there

6    and you've done something, okay?  The Supreme Court said

7    hunches don't work.  They need to be corroborated by some sort

8    of clearly articulable thing about it other than your general

9    hunch and the hair on the back of your neck is standing up.

10           So you have a hunch is a no.  A reasonable suspicion

11   is sure, you can do that.  What's an arguable reasonable

12   suspicion?  It's something more than a hunch, but less than

13   reasonable suspicion.  And the question is is if I accept that

14   that is the state of the law that I must apply, which I don't

15   see a Supreme Court case has decided this and I'm not so sure

16   the other circuit has clearly decided this issue, could there

17   be an argument made then that there's arguable reasonable

18   suspicion here, Ms. Ringer?

19           MS. RINGER:  I don't think so, Your Honor, and the

20   arguable probable cause, you know, standard, it's not arguable

21   reasonable suspicion and that's --

22           THE COURT:  No, no, no, that's separate.  So that's

23   separate; right?  But then there are some cases that talk about

24   arguable reasonable suspicion in the context of, I guess,

25   illegal *Terry* stops; right?  Those *Terry* stops that do not rise

1    to reasonable suspicion; right?  So to conduct an investigatory

2    stop is what I'm getting at here.  Officers responded to a 911

3    call.  Here's what they have:  Erratic behavior, acting weird

4    in the -- by the gas pumps.  Officer shows up.  That's what the

5    officer knows.  Officers don't know if they're getting into a

6    dangerous situation.  They don't know what's going on.  They

7    know that they're responding to a 911 call, and as your --

8    counsel for the defendant said, you know, anything could

9    happen.  So they arrive on the scene.  And perhaps they should

10   not have seized Mr. Jones at the time that they -- there wasn't

11   enough of a match.  Black T-shirt and an African-American male

12   is what I see to be a match here.  I don't see him acting weird

13   when they arrived.  I think he started to act weird after the

14   officer's asking a bunch of questions and, candidly, a lot of

15   us would act weird, but is there any position or argument that

16   a plaintiff that this still wouldn't even be arguable

17   reasonable suspicion and why?  You've already said no, but why?

18        MS. RINGER:  Well, Your Honor, you know, again, it

19   goes to what did the, you know, what were they there to

20   investigate and what did they find when they got there?  They

21   were there to investigate, at most, a misdemeanor.  This was

22   not like that case that, you know, defendant's counsel cited

23   where with, you know, a gun and domestic violence and all of

24   these other felonies.  This is just somebody is harassing

25   people at the gas pumps.  My guess is, you know, it's probably

 1    asking them for money or something like that.

 2          So they get there.  They find this guy and they start

 3    questioning him.  And he's overly friendly, in the words of the

 4    officer, so he draws his Taser.  I mean, you know, I don't

 5    think that's a objectively reasonable, you know, response.  So,

 6    at that point, I think everything, you know, is tainted by how

 7    the officer's responding to him.  I think, especially when we

 8    look at society and things that have happened, you know, in the

 9    news to African-American men, you know, getting arrested, that

10    he had a, you know, Holley Jones has a reasonable, you know,

11    belief that he's scared, you know, and that's what you see when

12    he gets tased.  He's a scared person running inside yelling for

13    help when he gets tased without warning.  And, you know, and I

14    know this is going to sound strange that I'm quoting Star Trek

15    here, but I think it's reasonable in light of what both you and

16    the opposing counsel had brought up about, you know, what do --

17    the ideas of what a police officer in his, you know, worried

18    about his safety has to feel, but, you know, and I was in the

19    U.S. Army myself.  And one of my favorite moments in all of

20    Star Trek is an issue where this one officer fired on a

21    civilian vessel because it just appeared and it scared him and

22    he thought maybe it was aggressive.  And Captain Sisko says

23    well, you know, sometimes when we wear this uniform, we put

24    ourselves in situations where we might not -- we might lose our

25    lives, but if you're going to put the lives of civilians, you

1    know, above your own, then you don't deserve to wear the

2    uniform.  And that's kind of my whole approach to, you know, to

3    policing and to the military and everything else is, you know,

4    you're putting on that uniform.  You deserve to be held to a

5    higher standard than, you know, some guy at a convenience store

6    who's buying some snacks, really.  I mean, you know.

7         THE COURT:  And I definitely understand Mr. Jones'

8    argument and I really appreciate your argument today, Counsel,

9    as I appreciate the argument of the sheriff here.  I'm sorry,

10   of the City of Fort Myers Police Department's counsel.

11        Is there anything you would like to add, Mr. Burandt,

12   in terms of the questions -- responses to the questions or

13   anything you would like to respond to from your friend at the

14   other side of this virtual courtroom?

15        MR. BURANDT:  Not that it matters, and I appreciate

16   the quote from Star Trek, I am inclined to agree with you.

17   After being a cop and representing cops for 35 years, I agree.

18   I think you do -- the job has some risks and you take those

19   risks, but you have to draw the line and protect yourself as

20   well as the public.  Obviously, you put the public first.

21        One thing I wanted to remind the Court, and I'm sure

22   you're aware of this, but lying to a police officer or not

23   disclosing your name is a misdemeanor in the State of Florida.

24   Fleeing from a police officer is a misdemeanor in the State of

25   Florida.  You have to obey the lawful commands of a police

1    officer.  It's called obstruction of justice if you don't.

2             THE COURT:  Or it's resisting without violence is the

3    Florida misdemeanor.

4             MR. BURANDT:  And my take on that is --

5             THE COURT:  Right.

6             MR. BURANDT:  -- is that you have to be being

7    arrested before you can be charged with resisting arrest, and I

8    don't think they had arrested Mr. Jones.  I guess you could

9    make an argument they had.

10            THE COURT:  That's the prong of a prima fascia case

11   of resisting without violence.  I've written an opinion on that

12   as a second DCA judge.

13            So my question is -- for the sheriff is is there any

14   difference in the way Officer Robles should be treated as

15   compared to Officer Barlow or are they equally liable here

16   should the Court determine that qualified immunity does not --

17   I'm sorry, should the Court determine that there was a clearly

18   established right that was violated in terms of there not being

19   a reasonable suspicion to conduct an investigatory stop here?

20            MR. BURANDT:  Well, I think Robles as the guy that

21   used the Taser is --

22            THE COURT:  Yes.

23            MR. BURANDT:  -- clearly entitled to qualified

24   immunity because I think he was just acting based on beliefs

25   and information he had gotten.

1          THE COURT:  So it was my understanding that it was --

2     I thought Officer Barlow used the Taser.

3          MR. BURANDT:  Am I mistaken?

4          THE COURT:  Am I right?

5          MS. RINGER:  I believe so.

6          THE COURT:  Yeah.  So it was Officer Barlow that --

7          MR. BURANDT:  Yeah, you're right, I'm sorry.  So

8     reverse that.  Barlow should be definitely entitled to

9     qualified immunity because he was acting based on information

10    he had from Officer Robles and he's entitled to rely on that.

11         Robles should be granted qualified immunity because

12    he had a reasonable suspicion to do the *Terry* stop and -- but I

13    do get your point and I'm not sure we actually briefed that.

14         THE COURT:  No.

15         MR. BURANDT:  I appreciate the --

16         THE COURT:  It's all culled together and that's my

17    bigger concern here is it doesn't escape the Court of the

18    repercussions of a denial of qualified immunity here.  Now

19    we're attacking and going after officers' homes, their

20    property, at that point, and the Court has spent an inordinate

21    amount of time studying this case twice.  The first status

22    hearing, I didn't notice particular questions I had, so I

23    wanted to make sure that, given the briefing here as well as

24    scheduling this argument after I have already completed a draft

25    of this order on summary judgment, that I expressed in a

1    written order questions that I needed help answering.  So if I

2    appeared somewhat frustrated on the front end, Mr. Burandt,

3    it's because I'm trying to get it right here.  And if you have

4    someone coming in that hasn't looked at the video in a long

5    time and doesn't know who tased who, it's frustrating to the

6    Court.  There's a line in the sand that we judges have to do is

7    counsel need to make their own arguments here.  Very few of the

8    arguments that I've raised here have been raised by the police

9    department, which is frustrating, so I wanted to provide an

10   opportunity to address my concerns prior to issuing my order.

11        In the event of a denial of qualified immunity, I

12   would expect perhaps an interlocutory appeal; is that correct,

13   Mr. Burandt?

14        MR. BURANDT:  I'd have to discuss that with the

15   client and the PBA.

16        THE COURT:  Yeah.

17        MR. BURANDT:  The Police Benevolent Association.

18        THE COURT:  Yeah, I'm aware of it.

19        The inclination of the Court now is I went into this

20   not confident that a grant of qualified immunity was warranted

21   here based on the case provided.  The clearly established right

22   here is a lack of reasonable suspicion from a 911 call, an

23   anonymous 911 call, to a detention that occurred inside of the

24   7-Eleven.  The matters only escalated upon the actions of the

25   officers.

1          That said, I'm going to take the information from

2     both counsel here, including the citations of authority that

3     have been provided and study those accordingly.  It's going to

4     be up to the parties on what they want to do at this point.

5     I'm not going to get in the business of the parties, but in my

6     experience in representing officers, defending officers as

7     counsel for the Department of Justice in qualified immunity

8     claims, in excessive force claims, the Court might want to

9     suggest settlement negotiations at this time.  It's completely

10    up to the parties, but that's something that I would probably

11    be getting on the phone on pretty soon because it may behoove

12    these officers.

13          Is there anything else, Counsel?

14          MR. BURANDT:  No, and I appreciate the time you're

15    putting into this and the questions you asked.  I will

16    discuss -- the problem here is he doesn't have any damages.

17    He's a drug dealer so he can't argue lost wages.  He didn't

18    have any, to my knowledge, any medical bills or anything, so

19    what are we talking here?

20          THE COURT:  And that's what you have to talk about,

21    if you want.

22          MR. BURANDT:  And the fact is that these guys are

23    uncollectible.  So I don't know why we're spinning our wheels.

24    My inclination would be to try the case and win it.  This is

25    still the Deep South and -- knock on wood -- we haven't lost

1    one yet down here.

2              THE COURT:  That's disheartening.

3              MS. RINGER:  Is your prospective that you --

4              THE COURT:  No, no, you don't ask questions, Counsel.

5    Thank you.

6              MS. RINGER:  Okay.

7              THE COURT:  So we are going to, at this point in

8    time, conclude the hearing.

9              Mr. Burandt, I really appreciate your time today and

10   your confidence is clear in this case.  I would still

11   nonetheless suggest such.  I would also suggest to the city

12   police department that they consider a negotiation here.

13             In terms of damages, in this instance, that's not

14   addressed at this particular time, but I am going to say this

15   and say it for the record:

16             I am shocked, disappointed at the comment of the

17   officers' counsel here about it being the Deep South and we

18   haven't lost one yet.  I am shocked.

19             MR. BURANDT:  Why are you shocked?  That's the truth.

20   These people are conservative people.  Ask Judge Steele.  I've

21   tried one in front of Judge Steele.  I've tried one in front of

22   Judge Magnusson.  This is a very conservative area.  That's all

23   I meant by that.  It's a conservative area.

24             THE COURT:  Thank you, Counsel.  I appreciate

25   everyone.  I'll issue a new scheduling order.  This court shall

1    stand in recess.

2              MS. RINGER:  Thank you, Your Honor.

3              (Proceedings were concluded at 3:10 p.m.)

4                    CERTIFICATE OF REPORTER

5    UNITED STATES DISTRICT COURT )

6    MIDDLE DISTRICT OF FLORIDA   )

7              I, Stacey E. Raikes, RMR, CRR, Official Court

8    Reporter for the United States District Court, Middle District

9    of Florida, do hereby certify, pursuant to Section 753, Title

10   28, United States Code, that I was authorized to and did

11   stenographically report the foregoing proceedings; and that the

12   foregoing pages constitute a true and complete computer-aided

13   transcription of my original stenographic notes taken by the

14   undersigned in the above-entitled matter to the best of my

15   knowledge, skill, and ability.

16        I further certify that I am not a relative, employee,

17   attorney, or counsel of any of the parties, nor am I a relative

18   or employee of any of the parties' attorneys or counsel

19   connected with the action, nor am I financially interested in

20   the action.

21        IN WITNESS WHEREOF, I have hereunto set my hand at Fort

22   Myers, Lee County, Florida, this 16th day of June 2021.

23

24   _____
     STACEY E. RAIKES, RMR, CRR

25            Official Court Reporter