UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

HOLLEY JONES,

          Plaintiff,

v.                                    Case No. 2:19-cv-114-JLB-NPM

ANDREW BARLOW and CHRISTIAN
ROBLES,

          Defendants.

_____/

# ORDER

Plaintiff Holley Jones brought this action under 42 U.S.C. § 1983 against Defendants Andrew Barlow and Christian Robles, two officers of the Fort Myers Police Department (collectively, "the Officers"), after an incident which resulted in Mr. Jones being twice tased by Officer Barlow inside a 7-Eleven convenience store, arrested, and charged in Florida state court. The events leading to this incident were captured on the Officers' body cameras. After the state of Florida dropped the charges against Mr. Jones, he filed a complaint in this Court alleging myriad violations of his constitutional rights.

Specifically, Mr. Jones's operative complaint alleges the following violations of his Fourth and First Amendments rights: (1) unlawful detention and arrest; (2) excessive force by Officer Barlow; (3) unlawful search; (4) malicious prosecution; and (5) First Amendment retaliation. (Doc. 124.) The Officers move for summary judgment, arguing that the evidence fails to show a violation of Mr. Jones's

constitutional rights, and, alternatively, they are entitled to qualified immunity.  (Doc. 133.)

After reviewing the parties' briefing, the Court set a hearing on the Officers' summary judgment motion and directed the parties to address particular questions that were not discussed in their papers.  Unfortunately, neither side adequately addressed the Court's questions, which only strengthened this Court's initial impression—this case ought not be resolved at the summary judgment stage.

Viewing the facts in the light most favorable to Mr. Jones, which the Court must at this stage of litigation, the Officers' motion for summary judgment is **DENIED**.  And although Officers' counsel who appeared at the summary judgment hearing dismissed the Court's suggestion to consider settlement discussions for the Officers, the Court nonetheless renews its prior suggestion.  Lastly, by separate order and upon completion of this litigation, the Officers' counsel who appeared at the summary judgment hearing will be ordered to appear before the Grievance Committee for the Middle District of Florida to account for his conduct during the summary judgment hearing.

## BACKGROUND[1]

### I.   An anonymous 911 caller reports a black male "acting very odd" in the parking lot of a 7-Eleven convenience store.

At approximately 12:38 p.m., on April 15, 2018, the Fort Myers Police Department received a 911 call from an anonymous tipster who reported that an

---

[1] For the most part, the Officers' purportedly "undisputed" facts refer to their body camera footage.  The Court has reviewed this footage multiple times and finds that the video footage either contradicts or does not support many of the Officers'

"Afro-American" man was "acting very odd" in the parking lot of a 7-Eleven convenience store.  The caller stated that the man got out of a small, black SUV and was "yelling at" and "chasing" people in the parking lot.  According to the caller, the man "look[ed] like he [was] high on something."  The caller describes the suspect as a black male, young (about twenty-five years old), tall (about six feet), "very lean," and wearing "a black shirt and green pants."  (Doc. 111-1.)

## II.   Officer Robles confronts Mr. Jones inside the convenience store and demands that Mr. Jones go outside with him.

Officers Robles was the first to arrive at the 7-Eleven, only a couple minutes after the 911 call, around 12:40 p.m.  The following facts are based on the footage from Officer Robles's body camera.[2]  (Doc. 111-3.)

Officer Robles appears to have just stepped inside the 7-Eleven store when he turns on his body camera.  Initially, he turns back around to scan the parking lot from inside the store.[3]  The parking lot was well-lit by the natural light of a typical

---

"undisputed" facts.  The Court need not credit the Officers' version where it "is blatantly contradicted by the record, so that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Accordingly, the Court recites the facts in this section in the light most favorable to Mr. Jones and indicates in footnotes how they vary from the Officers' purportedly "undisputed" account.

[2] Video footage from Officer Barlow's body camera (Doc. 111-4) is cumulative of the footage from Officer Robles's body camera, except for a moment when Mr. Jones is said to have "stumbled into a display and growled."  (Doc. 128 at 2; see infra note 8.)  Officer Barlow's body camera has better sound quality and provides a clearer view of Mr. Jones at this point in the encounter.

[3] The Officers assert that "[u]pon arriving at the gas station, Officer Robles scanned the parking lot."  (Doc. 133 at 4, ¶ 5.)  The video footage does not show that Officer Robles scanned the parking lot "upon arriving at the gas station."  It shows Officer Robles scanning the parking lot once he was already inside the store.

afternoon day in April.  The Officers assert that when Officer Robles scanned the parking lot, he was "[u]nable to identify anyone matching the caller's description."  (Doc. 133 at 4, ¶ 6.)  Mr. Jones accurately points out that the footage of Officer Robles scanning the parking lot shows another black male (who looks to be tall, in his mid-twenties, and with a lean build) standing in the parking lot.[4]  (Doc. 137 at 2, ¶ 6.)  Regardless, Officer Robles does not react to this man's presence in the parking lot, but instead turns his attention to another black male standing in front of the checkout counter with his back toward the front door.  The man has an average-to-heavy build and is of average height; he is wearing a black hat, a black t-shirt, and gray shorts (not green pants).  He is not "yelling" or "chasing" people and is neither tall nor "lean," as the 911 caller described. And he does not appear intoxicated.

As Officer Robles moves closer to that man, he says, "Hey buddy, when you get a minute, I gotta talk to you outside."[5]  The man, later identified as Mr. Jones, appears to say something as he takes off his hat and turns to look at Officer Robles. But Mr. Jones's comment is inaudible.  In all events, Officer Robles responds, "I just

---

[4] This man can be seen on several more occasions in the background of the footage from Officer Robles's body camera when he is engaging with Mr. Jones inside the store.  After turning his attention back inside the store for a moment, Officer Robles briefly turns around again to look in the parking lot, at which point the man appears for a second time in Officer Robles's line of vision.

[5] It is not clear why Officer Robles ordered Mr. Jones out of the store.  He gave multiple justifications, including privacy (Doc. 137-6, Tr.2, at 223:24–224:5), fearing for his safety after Mr. Jones purportedly reached for his gun belt (Id., Tr. 1, at 18:16–2), and believing that Mr. Jones may have been intoxicated.  (Id., Tr. 1, at 79:3–9.).

gotta talk to you. . . .  Are you done with the uh . . . [inaudible]?"  At this point,
Mr. Jones walks away from the checkout counter toward Officer Robles, leaving
behind whatever he was purchasing.  He stops and says to Officer Robles, "What's
up, bro?"  Officer Robles says, "you got a sec?"  Mr. Jones says, "yeah, what's going
on?"  Officer Robles says, "Let's go outside."  Mr. Jones replies, "Okay, well what's
going on?"  Officer Robles responds in a more intense tone of voice, "Let's go
outside."  Mr. Jones responds in a questioning tone, "Okay . . . Who's your boss?
What's going on?  What's the problem?"  Officer Robles does not answer Mr. Jones,
but instead points to the checkout counter and says, "Get your stuff."  Mr. Jones
responds, "okay," and turns toward the checkout counter as if he is going to follow
Officer Robles's command to "get [his] stuff."  But Mr. Jones then turns back around
to face Officer Robles and asks him for the fourth time, "So what's the problem?"

Officer Robles finally answers Mr. Jones, "There is no problem.  I got a call in
reference <u>to you</u>, so I want to make sure everything is okay.  So we're going to go
outside so that way no one knows your business."  (Emphasis added.)  Mr. Jones
begins shaking his head from side to side, saying, "Nah, no, no . . . . You don't even
know me like that.  I don't even know why you talking about that right there."  As
he says this, Mr. Jones turns from Officer Robles as if to walk away.

The sound of the recording then becomes somewhat garbled, but Mr. Jones
seems to respond to something Officer Robles said.  Mr. Jones then starts to walk
away while looking over his shoulder at Officer Robles.  After only a few steps,
however, Mr. Jones turns back toward Officer Robles, saying (in an earnest tone of

voice), "Sir, hey, what's your name?" as he extends his arm in the common manner someone would to shake hands.[6]

As this is happening, the body camera shows only Mr. Jones's face and part of his extended arm.  Officer Robles is heard saying in a slightly more intense voice, "No, no, no, I'm all right."  Mr. Jones responds in a solicitous tone, "Are you alright, sir?"  Officer Robles, responds, somewhat sternly, "I'm all right.  Don't touch me."[7] Mr. Jones responds, "You sure?" while reaching both of his empty hands toward Officer Robles in what appears to be a gesture (sincere or not) of concern.  Officer Robles repeats the command, "Don't touch me."  Someone behind Mr. Jones is heard cautioning Mr. Jones, "Hey! Hey! Hey!"  Mr. Jones looks back at whomever was speaking, turns back to Officer Robles, and then throws his hands in the air saying, "Okay, I won't touch."  With that, Mr. Jones turns and starts to walk back toward the checkout counter.

---

[6] The Officers admit that Mr. Jones "turned around to shake Officer Robles's hand." (Doc. 133 at 5, ¶ 11.)  In his deposition testimony, however, Officer Robles represented multiple times that Mr. Jones was reaching for Officer Robles's gun belt. (Doc. 137-6, Tr. 1, at 17:17–18:15.)  That assertion is not repeated in the Officers' motion for summary judgment.  Officer Robles's gun belt is not visible in the body camera footage, and Officer Robles does not mention anything about the gun belt in the recording.  None of the post-incident reports mention anything about Mr. Jones reaching for Officer Robles's gun belt.  At the state court suppression hearing, Officer Robles clarified that Mr. Jones never actually touched the gun belt.

[7] The Officers claim that "Officer Robles recoiled" from Mr. Jones's offer of a handshake and asked Mr. Jones not to touch him." (Doc. 133 at 5, ¶ 12.)  The video footage does not show Officer Robles in that moment, so it is impossible to tell if he "recoiled."  The video footage also demonstrates that Officer Robles instructed—not asked—Mr. Jones to not touch him.

Officer Robles follows Mr. Jones and, in a more intensified voice, says, "I'm going to tell you right now . . . don't touch me.  Okay?"  At this point, Mr. Jones has returned to the checkout counter.  Officer Robles continues to approach Mr. Jones, saying in a demanding voice while moving to Mr. Jones's other side, "You need to step out of the store right now!  Okay?  Don't touch me.  Don't put your hands on me.  And you need to . . . , you need to . . . [inaudible]."  At this point, Officer Robles has positioned himself close to Mr. Jones, who is bent at the waist and leaning over the checkout counter with his head facing down as Officer Robles is issuing these directives to him.  The store clerk standing behind the checkout counter looks directly at Officer Robles, who says in a slightly tense or angry voice, "Are you done with him?"  Mr. Jones, with his head still facing down at the checkout counter, states, "Nope."  Officer Robles then says, "Alright, sir, you need to leave the store."  Mr. Jones stands back up straight and says, "I'll leave if you tell me to."  Officer Robles again says, "You need to leave the store, okay?"

## III.  Officer Barlow arrives and joins with Officer Robles in demanding Mr. Jones go outside with them.

At this point, about one-and-a-half minutes into the encounter, Officer Barlow enters the store.  Officer Barlow walks toward Mr. Jones from the opposite side from where Officer Robles is standing and says, "Are you going to leave, buddy?  You good?  You good?"  Mr. Jones looks at the two Officers and says, "I didn't do nothing wrong, man."  Officer Robles says, "You were real close to doing something wrong."  Officer Barlow says, "All right man, let's go, let's go."

Then comes the moment when the Officers claim Mr. Jones seemed intoxicated and displayed aggression.[8]  The body camera footage shows Mr. Jones avoiding direct eye contact with the Officers momentarily, while his eyes dart quickly around the room.  He then leans slightly backward with his weight on one foot (without falling into a merchandise display), opens his eyes wide, and says "whoa" while putting his thumb under his armpit with the rest of his hand over his chest.  Mr. Jones quickly shifts his weight back to a normal stance and appears to either flex his chest muscles or thrust out his chest several times, making an odd, deep-toned garbling noise.  The Officers describe the noise as "growl[ing]." (Doc. 133 at 2.)  But it is equally plausible that Mr. Jones was trying to clear his throat.

It does not appear from the video recording that either of the Officers responded to (or even acknowledged) Mr. Jones's garbling sound at that time. Instead, Officer Robles looks at the store clerk and asks, "Is he done in the store? Do you want him out?"  The store clerk standing behind the counter says something inaudible at first, to which Officer Robles says, "What's that?"  The store clerk responds, "He didn't do nothing."  Officer Robles repeats the clerk's statement as a question in a skeptical tone of voice, "He didn't do nothing?"  Regaining his

---

[8] According to the Officers, Mr. Jones "did not respond [to Officer Barlow] for several seconds and appeared disoriented—scratching his head and looking at the store clerk."  (Doc. 133 at 7, ¶ 23.)  They say he "then lost his balance and fell into a display," after which, "[w]hile leaning against the display, [he] growled and clinched his teeth," and "also puffed out his chest at the officers in a twitching motion."  (Id. at 7, ¶¶ 24–26.) But, as explained below, footage from the body camera worn by Officer Barlow, who was closest to Mr. Jones at the time, does not show Mr. Jones appearing disoriented, losing his balance, or falling into a display.

composure, Mr. Jones states, "Nah."  Officer Robles then says to Mr. Jones, "Well, let's go outside and talk."  Mr. Jones then says, "I didn't do s**t wrong."  Officer Robles repeats, "Okay, well let's go outside and talk."  Mr. Jones shrugs his shoulders, puts on his sunglasses, and begins to walk calmly away with the Officers toward the front door.  As they approach the front door, Officer Robles reiterates, "[Y]ou're not gonna be aggressive and touch me, I'll tell you that right now."  Mr. Jones answers, "Nah, I ain't gonna do that."  The store clerk interjects, "He hasn't been aggressive."  Officer Robles responds to the clerk in an exasperated tone, "He just touched me, okay?"

## IV.   Once outside with the Officers, Mr. Jones refuses an order from Officer Barlow and runs back inside the store.

Once the Officers and Mr. Jones go outside the store, Officer Barlow gives Mr. Jones multiple orders to "stand right there in front of the bumper," pointing to a police car parked in the store's parking lot located immediately outside the front door of the store.[9]  A few feet separated the front bumper from the front door of the store.  Mr. Jones refuses Officer Barlow's order and walks back toward the store while saying, "Whoa, whoa, talking to me is one thing, but trying to put that on me is another thing."  As Mr. Jones opens the door to the store, Officer Barlow reaches

---

[9] In his deposition, Officer Robles testified that ordering Mr. Jones to stand in front of the bumper was a precursor to searching him.  (Doc. 137-6, Tr. 2, at 171:2–14.)  Officer Barlow offered differing justifications for the order, claiming that the Officers were going to "give him a trespass and call it at that," or "run his name and get all his information."  (Doc. 137-4, Tr. 2, at 84:16–85:20.)  There are myriad places in the record where the Officers contradict each other and even themselves.

to grab him, but Mr. Jones pushes through Officer Barlow's arm and runs back inside the store.

## V. Officer Barlow tases Mr. Jones adjacent to the checkout counter inside the store.

Once back inside the store, Mr. Jones runs toward the checkout counter yelling, "I ain't do nothing f***ing wrong!  I ain't do nothing wrong!"  Mr. Jones crashes into a flower display by the counter, spilling water on the floor.  Officer Barlow—who is right behind Mr. Jones—deploys a taser.  Mr. Jones immediately falls to the floor into or adjacent to, a puddle of water that appeared to collect on the floor from the flower display, screaming in pain.  Officer Barlow then tases him a second time as he is lying in (or at least adjacent to) a puddle of water.  (Doc. 137 at 7, ¶¶ 60–62.)  Over Mr. Jones's screaming, the store clerk can be heard saying in a louder voice, "You don't know him.  You don't know.  Maybe there's something wrong with him."  Officer Robles answers, "That's one of the reasons why we're trying to talk to him."[10]

## VI. The Officers search Mr. Jones and find illegal drugs in his pockets.

Officer Barlow deactivates the taser, and the Officers then handcuff Mr. Jones and escort him back outside through the front door of the store.  The Officers

---

[10] The Officers' Statement of Material Facts describes (1) Mr. Jones "backpedaling into the store with his fists clenched"; (2) Mr. Jones "collid[ing] with a customer at the counter"; (3) Officer Barlow drawing his taser and pointing it at Mr. Jones; and (4) Mr. Jones seeing the taser but "[u]ndeterred [and] . . . fle[eing] towards the left side of the store."  (Doc. 133 at 8, ¶¶ 34–37.)  Mr. Jones, though, describes the Officers chasing him, attempting to grab him, and, inside the store, tasing him "without any verbal warning."  (Doc. 137 at 5, ¶ 36; 7, ¶ 59.)  The video footage supports Mr. Jones's version of events.

thereafter prop Mr. Jones against the back of the car, remove the two taser prongs which were lodged into Mr. Jones's body, and begin to search his pockets.  While being searched, Mr. Jones repeatedly asks the Officers what he is being arrested for and what he did wrong.  The Officers say, "you just tried fighting us and running back in the store," and "we told you not to go back in the store, we told you to come outside."  Ultimately, the Officers found illegal drugs in Mr. Jones's pockets.

## VII.   The state court suppresses the illegal drugs determining that the Officers conducted an illegal search of Mr. Jones, and the Florida state criminal charges against Mr. Jones are dismissed.

Mr. Jones was charged in Florida state court with: (1) possession of heroin with intent to sell, manufacture, or deliver (third-degree felony); (2) resisting an officer without violence (misdemeanor); and (3) possession of twenty grams or less or marijuana (misdemeanor).[11]  (Docs. 133-3, 133-5.)

Mr. Jones moved to suppress the controlled substances found in his pockets, arguing that the Officers lacked reasonable suspicion to detain him.  (Doc. 133-3 at 3.)  An audio recording of the state suppression hearing (included in the summary judgment record) demonstrates that the state court heard testimony from Officer Robles and reviewed his body camera footage.  (Doc. 137-5.)

After hearing legal arguments on the motion to suppress, the state court ruled as follows from the bench:

---

[11] The probable cause affidavit also includes a charge for breach of peace (Doc. 133-5 at 3.), but it appears that charge was never formally brought. And despite the Officers' positions since the incident—namely that Mr. Jones was aggressive—the state charged Mr. Jones with misdemeanor resisting an officer <u>without violence</u>.

> There was no corroboration of the anonymous tip. [Officer Robles] didn't see anything illegal. He didn't see anything suspicious. Defendant—I should say, a reasonable person—would have considered the Officers' requests to step outside to be an order. Especially with two of them, especially the tone of some of the conversation. I grant the motion to suppress. Candidly, I really don't want to. But the law is in [Mr. Jones's] favor in my opinion this time. I think you [Mr. Jones] were being overly friendly with the Officer because you knew you had dope on you. Like, "I'll be nice to him, I'll shake his hand. That way, maybe he won't search me." That's what happened.

(Id.)[12] The State then dropped all charges against Mr. Jones. (Doc. 133-3.) About two months later, Mr. Jones filed this action against the Officers. (Doc. 1.)

## VIII. The Court directs supplemental briefing on summary judgment and holds a hearing on the Officers' motion for summary judgment.

After the Officers' summary judgment motion was fully briefed, the Court set a hearing on the motion and directed the parties to address four questions which were not discussed in the papers:

1. Assuming Mr. Jones was seized by Officer Robles before Officer Barlow arrived at the 7-Eleven store, did Officer Robles have reasonable suspicion to conduct a <u>Terry</u> stop of Mr. Jones inside the 7-Eleven?

2. If the answer to question 1 is no, is Officer Robles protected by qualified immunity? If so, why?

3. If the answers to questions 1 and 2 are no, is Officer Barlow also liable for the unlawful detention by Officer Robles? If so, why? Again,

---

[12] The Officers argue that the state court's suppression ruling is not binding on this Court. (Doc. 133 at 15.) Mr. Jones does not argue that it is binding, and this Court does not find that it is. The state court's succinct summary of what the video recordings show is set forth in this opinion to demonstrate that this Court's own description of what is depicted in the video is in line with another judicial officer's interpretation of the video. The Court has not relied upon the state court's findings of fact and conclusions of law in its summary judgment analysis, as this Court is not bound by the state court's suppression ruling.

assume that Mr. Jones was seized before Officer Barlow arrived at the 7-Eleven store.

4. If the answers to questions 1 and 2 are no, is Officer Robles's qualified immunity coextensive with Officer Barlow's? Stated differently, is there legal authority suggesting that Officer Barlow may be protected by qualified immunity for some of his post-detention actions (like deploying his taser) even if Officer Robles's detention is both unconstitutional and not protected by qualified immunity?

(Doc. 150.) Neither side came prepared with any definitive answers to these questions. Some moments from the hearing nevertheless bear mentioning, if only for their troubling nature. The Officers' counsel began his argument by saying, "No disrespect, but I was a police officer for 11 years and I worked on the road and there are certain things you see and do in response to how people react to you. <u>And sometimes that can't be specifically articulated</u>, but you just know something's not right." (Doc. 158 at 7:1-4) (emphasis added). This was an interesting tactical choice considering that "articulable suspicion" is part of the controlling legal standard. He also made several arguments that hinged on the Officers' subjective beliefs and experiences, rather than the objective factual basis for their seizure. (<u>Id.</u> at 7:6–8:21). Again, this was an interesting tactical choice given that a seizure must be supported by objective facts.

The factual assumptions of the Officers' counsel were likewise curious. For example, he stated, "I think [Mr. Jones] was outside when [the Officers] arrived [at the 7-Eleven], but I can't be positive." (<u>Id.</u> at 11:1–2.) This is a basic factual error. Anyone who has watched the opening seconds—not minutes, but seconds—of the bodycam footage would know that Mr. Jones was not outside of the store. When

pressed, the Officers' counsel admitted, "I haven't seen the video in a while. Probably over a year now." (Id. at 11:21–22.)

The argument did not improve from there.  For example, the Officers' counsel contended that Mr. Jones was not seized until he broke away from the Officers and ran back into the store; in the summary judgment motion, the Officers argued that Mr. Jones was seized when he complied with the Officers commands to leave the store.  (Doc. 133 at 12–13; Doc. 158 at 14:10–13.)  He also conceded that there was "obviously . . . no probable cause," which undercuts the motion's position that there was at least "arguable probable cause" for purposes of qualified immunity.  (Doc. 133 at 22; Doc. 158 at 19:5 (emphasis added).)

Toward the end of the argument, the Officers' counsel addressed a portion of the questions which the Court ordered supplemental briefing on by arguing that Officer Barlow "should be definitely entitled to qualified immunity because he was acting based on information he had from Officer Robles and he's entitled to rely on that," and Officer Robles "should be granted qualified immunity because he had a reasonable suspicion to do the Terry stop . . . but I do get your point and I'm not sure we actually briefed that."  (Doc. 158 at 37:7–13.)

At the conclusion of argument, the Court began discussing the possibility of settlement in advance of trial with both attorneys.  After a few words, the Officers' counsel made the following statement:

> "[T]he fact is that these guys are uncollectible. So I don't know why we're spinning our wheels.  My inclination would be to try the case and win it.  This is still the Deep South and—knock on wood—we haven't lost one yet down here.

(Id. at 39:22–40:1.)  When the Court expressed its disappointment at counsel's reference to the "Deep South" and his overall brazen representation that the Court's moving forward with Mr. Jones's constitutional claims was merely "spinning our wheels" because the Officers were "uncollectible," he attempted to (partially) clarify as follows:

> Why are you shocked?  That's the truth.  These people are conservative people.  Ask Judge Steele.  I've tried one in front of Judge Steele.  I've tried one in front of Judge Magnusson.  This is a very conservative area.  That's all I meant by that.  It's a conservative area.

(Id. at 40:19–23.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is only proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In other words, summary judgment is warranted if a jury, viewing all facts and any reasonable inferences therefrom in the light most favorable to plaintiffs, could not reasonably return a verdict in plaintiffs' favor."  Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1581 (11th Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact . . . ."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id.

<u>DISCUSSION</u>

**I.     Whether Mr. Jones's Constitutional rights were violated.**

The Officers seek summary judgment on all counts.  They maintain that they lawfully ordered Mr. Jones to exit the convenience store because they either did not need reasonable suspicion to stop and question Mr. Jones, or, if they did, reasonable suspicion existed.  Moreover, the Officers argue that Mr. Jones's conduct after he walked outside with them—fleeing back into the store—justified their use of force to subdue him, arrest him, and conduct a search incident to that arrest.  In short, the Officers contend that their conduct was lawful at every stage of events which, they maintain, refutes Mr. Jones's claims for unlawful detention and arrest, illegal search, excessive force, malicious prosecution, and First Amendment retaliation.

**A.     Mr. Jones's Unlawful Detention Claim.**

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Case law recognizes "three broad categories of police-citizen encounters" for Fourth Amendment purposes: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  <u>United States v. Perez</u>, 443 F.3d 772, 777 (11th Cir. 2006) (quoting <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989)).

The Supreme Court has held that police interactions in the first category do not implicate the Fourth Amendment.  <u>See</u> <u>United States v. Drayton</u>, 536 U.S. 194, 200–01 (2002).  Police encounters in the second and third categories, however, implicate one's Fourth Amendment right to be free from unreasonable seizures.

This case involves the second category of police-citizen encounters: an investigatory stop, also known as a <u>Terry</u> stop.  <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 30–31 (1968).

Generally, warrantless searches and seizures are presumptively unreasonable.  <u>See</u> <u>United States v. Gordon</u>, 231 F.3d 750, 754 (11th Cir. 2000) (citing <u>Horton v. California</u>, 496 U.S. 128, 133 (1990)).  But <u>Terry</u> stops are an exception.  Under <u>Terry</u> and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry</u>, 392 U.S. at 30.)  Importantly, the Court must assess "whether the officer's action was justified <u>at its inception</u>."  <u>Terry</u>, 392 U.S. at 20 (emphasis added).

"Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance."  <u>United States v. Freeman</u>, 735 F.3d 92, 96 (2d Cir. 2013).  Accordingly, the Court "must first determine when exactly" Mr. Jones was detained (or "seized").  <u>Id.</u>  Then, the Court must decide whether "there was reasonable suspicion for the stop 'at its inception.'"  <u>Id.</u> (quoting <u>Terry</u>, 392 U.S. at 20).

### 1.    Mr. Jones was "seized" when Officer Robles confronted him in the store and demanded he go outside.

A seizure occurs "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained."  <u>Perez</u>, 443 F.3d at 778 (quoting <u>Craig v. Singletary</u>, 127 F.3d 1030, 1041 (11th Cir. 1997)).  The Officers acknowledge that their questioning of Mr. Jones was backed by a show of authority

"early and often."[13]  (Doc. 139 at 2) (parentheses omitted).  Nevertheless, they contend that a "seizure" did not occur until after "the arrival of Officer Barlow" when "Jones finally compl[ied] with the [O]fficers' commands and exit[ed] the store."[14]  (Doc. 133 at 13.)  In support, the Officers cite California v. Hodari D., 499 U.S. 621 (1991).

In Hodari D., a suspect saw an officer approaching him and immediately ran. Id. at 623.  Before the officer caught him, the suspect tossed away "a small rock," which turned out to be crack cocaine.  Id.  The California Court of Appeal held that the suspect had been "seized" when he first saw the officer running toward him.  Id. The Supreme Court reversed and held that for a seizure to occur after an assertion of authority, the suspect must also submit to the assertion of authority.  Id. at 629.[15]

Based on Hodari D., the Officers argue that Mr. Jones was not seized until he left the store because it was not until then that he submitted to their show of

_____

[13] The Officers never actually argue that the encounter between Officer Robles and Mr. Jones was at any point consensual, and if they did, the Court likely would reject that argument for the reasons discussed infra at pp. 17–18.

[14] At the summary judgment hearing, the Officers' counsel argued that Mr. Jones was seized even later—when he ran back into the store.  (Doc. 158 at 14:10–13.)  As explained below, the Court finds that Mr. Jones was seized much earlier— before Officer Barlow even arrived.

[15] Hodari D. did not decide whether the officer had reasonable suspicion to initiate a Terry stop of the suspect because the state conceded that the officer did not.  See 499 U.S. at 623 n.1.  The Court observed, however, that fleeing upon the officer's approach would seem to give rise to reasonable suspicion.  Id.  The difference here, of course, is that Mr. Jones did not flee upon being approached by Officer Robles.

18

authority.  The Court disagrees.  Hodari D. applies only when an officer makes some show of authority, and the suspect flees.  See, e.g., United States v. Knight, 336 F. App'x 900, 902 (11th Cir. 2009) (citing Hodari D. for the proposition that, "even assuming that an officer's actions constitute a show of authority, an individual who fails to comply by fleeing the police is not seized").

In addition to Hodari D., the Officers cite the Second Circuit's opinion in Freeman, which they represent held that "a suspect who continued walking when approached by a police officer did not submit until physically restrained by the officer."  (Doc. 133 at 13.)[16]  The Officers appear to misread Freeman's holding. There, two officers observed a suspect walking along the road.  735 F.3d at 95.  In an effort to speak to him, one of the officers placed his hand on the suspect's elbow.  Id.  The suspect shrugged the officer off and kept walking, after which the second officer grabbed him around the waist in a "bear hug."  Id.  The officers were able to then bring the suspect to the ground by tripping him.  Id.  A brief struggle ensued, and the suspect was ultimately handcuffed and arrested.  Id.  The Second

---

[16] The Officers also cite United States v. Hughes, No. 1:16-cr-451, 2018 WL 1148125, at *4 (N.D. Ga. Jan. 29, 2018), adopted, 2018 WL 1128136 (N.D. Ga. Mar. 1, 2018), aff'd, 799 F. App'x 794 (11th Cir. 2020).  The district court's holding in Hughes is confusing.  A footnote in the opinion states that the suspect "was legally 'seized' not when the officers pulled over or asked him to stop walking but only as of when he submitted to the officers' show of authority."  Id. at *4 n.3.  But if that was so, then the officers did not need reasonable suspicion to pull over and ask the suspect to stop.  Yet the court analyzed that very issue at length, id. at *5 (describing the issue as whether the officers had reasonable suspicion "to pull their patrol car over and at least briefly detain and question the [d]efendant"), ultimately concluding that the officers did have reasonable suspicion to initiate the stop and therefore the suspect's Fourth Amendment rights were not violated, id.

Circuit held that the suspect "was physically restrained as soon as [the officer] grabbed him in a 'bear hug,' and thus the justification for the stop must have preceded [the officer's] grabbing of [the suspect]." Id. at 96 (citing Terry, 392 U.S. at 20). While the officers cited Hodari D. and argued that a seizure did not occur until the suspect was subdued, the Second Circuit rejected that argument, explaining that Hodari D. was not "applicable in the instant case, where [the suspect] never broke away from the police or tried to flee prior to being stopped." Id.

Freeman favors Mr. Jones, not the Officers. While Mr. Jones initially did not comply with the Officers' demands to leave the store (and thus did not outwardly "submit" to their show of authority), he never broke free from their interrogation or attempted to flee from inside the store. Id. at 97 ("Hodari D. [and similar cases] have no applicability where the initial seizure is neither broken away from or where the individual does not flee before he is seized.").

A suspect's failure to fully cooperate does not necessarily negate a seizure. See, e.g., United States v. Lowe, 791 F.3d 424, 432–33, 428 (3d Cir. 2015) (explaining that a suspect who did not comply with officers' commands to take his hands out of his pockets nevertheless was subjected to a "seizure" when, upon the officers' approach, the suspect "froze"); Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (reasoning that, even though the suspect declined the officer's request to roll down his window, he was seized "the very next moment, when [the officer] persisted rather than accepting [the suspect's] choice not to acquiesce," because

"[the officer] made it clear that [the suspect] was not free to ignore him <u>and would not be left alone until he complied</u>" (emphasis added)).

Partial submission only negates a seizure "where a suspect takes action that clearly indicates that he 'does not yield' to the officers' show of authority." <u>Lowe</u>, 791 F.3d at 433 (citing <u>Hodari D.</u>, 499 U.S. at 626).  Actions—like evasion or threatening the officer—are the touchstone of the <u>Hodari D.</u> analysis, not passivity.  <u>Id.</u>  A suspect is "seized" when he "reacts to a show of authority by not fleeing, making no threatening movement or gesture, and remaining stationary." <u>Id.</u> at 434.  Unlike <u>Hodari D.</u>, Mr. Jones reacted to Officer Robles's show of authority (ordering him outside) by remaining inside the store.  He did not flee the store, either during Officer Robles's show of authority or, ninety seconds later, when Officer Barlow arrived and also asserted his authority.  The body camera footage shows that Mr. Jones reacted to the Officers' show of authority by staying put and not making any threatening movements or gestures.  Accordingly, <u>Hodari D.</u> and its progeny do not govern this case.

Having disposed of the Officers' argument, the Court returns to the underlying question: the timing of Mr. Jones's seizure.  Mr. Jones was seized at the point in time in which a reasonable person in Mr. Jones's situation would have felt that he was not free to simply walk away from Officer Robles.  <u>See</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); <u>see also</u> <u>Brendlin v. California</u>, 551 U.S. 249, 255 (2007).  To identify this point in time, the Court must consider all the circumstances, including: "whether a citizen's path is blocked or

impeded"; whether the officers retained the individual's identification; "the suspect's age, education and intelligence; the length of the . . . detention and questioning; the number of police officers present"; whether the officers displayed their weapons; "any physical touching of the suspect[;] and the language and tone of voice of the police." Perez, 443 F.3d at 778 (quoting United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991)).

      Because the Officers rely solely on the submission rule of Hodari D., they never address this dispositive issue. In all events, the Court agrees with Mr. Jones that a reasonable person in his position would not have felt free to terminate the encounter with Officer Robles, who stood between Mr. Jones and the store entrance and repeatedly demanded that Mr. Jones go outside with him. See Mendenhall, 446 U.S. at 554 ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would [include] . . . the use of language or tone of voice indicating that compliance with the officer's request might be compelled"); see also Perez, 443 F.3d at 778 (including impediment or blocking of a citizen's path as a factor relevant to the seizure analysis). Even if Officer Robles's initial statement—"Hey, buddy, when you get a minute, I gotta talk to you outside"—could be interpreted as noncoercive, the next ten-or-more times Mr. Jones was commanded to go outside by Officer Robles (and later by Officer Barlow) while his path out of the store was blocked clearly resulted in a seizure. Indeed, the Officers acknowledge as much when they concede that Mr. Jones was "ordered outside early and often." (Doc. 139 at 2) (emphasis added, parentheses omitted).

Accordingly, viewing the facts in the light most favorable to Mr. Jones, Mr. Jones's liberty was restrained from the start of the encounter inside the convenience store—more precisely, when he was repeatedly ordered to leave.

> **2.  Viewing the evidence in the light most favorable to Mr. Jones, a reasonable jury could find that Mr. Jones's seizure by Officer Robles was not supported by reasonable suspicion.**[17]

Having concluded that Mr. Jones was seized when initially stopped by Officer Robles inside the convenience store, the Court now considers whether there was reasonable suspicion to support that stop "at its inception."  <u>Terry</u>, 392 U.S. at 20.

Under <u>Terry</u>, police officers need reasonable suspicion to make an investigative stop.  Reasonable suspicion "requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  <u>United States v. Boyce</u>, 351 F.3d 1102, 1107 (11th Cir. 2003) (quoting <u>United States v. Tapia</u>, 912 F.2d 1367, 1370 (11th Cir. 1990)).  "[R]easonable suspicion is determined by the 'totality of the circumstances,'" and if the circumstances of the detention are disputed, courts must

---

[17] As explained below, the Officers inexplicably divorce the existence of the constitutional violation from their qualified immunity analysis.  Had they structured their argument more logically, they would have framed the threshold existence of the alleged constitutional violation—the unlawful <u>Terry</u> stop—as something that a jury should decide if there is sufficient evidence.  <u>See</u> <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1267 (11th Cir. 2004) (explaining that once an official establishes that they were engaged in discretionary function, "the plaintiff must demonstrate <u>that a reasonable jury</u> could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question" (emphasis added)).

credit the non-moving party's version of events.  Id.; cf. Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000) ("Plaintiffs' version, if credited, shows no arguable reasonable suspicion. . . . Therefore, the district court correctly denied Defendants' motions for summary judgment[.]").

"While 'reasonable suspicion' is a less demanding standard than probable cause . . . the Fourth Amendment requires at least a minimal level of objective justification." United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (quoting Wardlow, 528 U.S. at 123).  "[A]n inchoate and unparticularized suspicion or hunch of criminal activity is not enough. . . ." Id. (internal quotation marks omitted) (quoting Wardlow, 528 U.S. at 124).  "[R]easonable suspicion must be based on 'the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience.'" United States v. Hardy, 806 F. App'x 718, 721 (11th Cir 2020) (quoting Terry, 392 U.S. at 27).

Because the Officers contend that the seizure did not occur until Mr. Jones submitted to their show of authority by going outside, their reply brief addresses the issue of reasonable suspicion at the start of the encounter in only a perfunctory way.  Their argument—made in the alternative to their argument that they had reasonable suspicion based on Mr. Jones's conduct—is that the anonymous 911 call was sufficient by itself to establish reasonable suspicion.

The Supreme Court has explained that an unreliable anonymous tip, "standing alone, would not warrant a man of reasonable caution in the belief that [a stop] was appropriate." Alabama v. White, 496 U.S. 325, 329 (1990) (internal

quotation marks omitted) (quoting <u>Terry</u>, 392 U.S. at 22).  For an anonymous tip to support an officer's suspicion of criminal activity, it must be accompanied by sufficient indicia of reliability.  <u>Id.</u> at 332.  According to the Officers, the anonymous call gave rise to "reasonable suspicion" that criminal conduct was afoot because the caller reported facts that suggested the suspect was committing the crime of disorderly intoxication, Fla. Stat. § 856.011, and the report was based on the caller's personal observations.  (Doc. 133 at 13.)

The Officers cite <u>Navarette v. California</u>, 572 U.S. 393 (2014), for their argument that the 911 caller's report of disorderly intoxication was reliable because it was based on the caller's personal observations.  The issue in <u>Navarette</u> was "whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness."  <u>Id.</u> at 401 (citing <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)).  The Court held that the 911 caller's report gave rise to reasonable suspicion of drunk driving because the caller reported "more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving."  <u>Id.</u> at 403.  Rather, the Court continued, the tipster "alleged a specific and dangerous result of the driver's conduct: running another car off the highway."  <u>Id.</u>  The Court explained that reasonable suspicion depends on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  <u>Id.</u> at 402 (internal quotation marks omitted) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996)).  Under that approach, the Court stated

that it could "appropriately recognize certain driving behaviors [like running another car off the highway] as sound indicia of drunk driving." Id.

Here, the anonymous caller reported that an individual was chasing people and "acting very odd" in the parking lot. The observed conduct of "acting very odd" does not, by itself, give rise to reasonable suspicion that a crime was being committed. The caller also reported that the individual "look[ed] like he [was] high on something." The Court finds that this statement by the tipster was insufficient to support a reasonable suspicion because it amounted to no more than a conclusory allegation that a crime was being committed. The only particularized behavior that the caller personally observed was the suspect "yelling at" and "chasing" people in the parking lot. Navarette requires this Court to apply common sense in deciding whether this reported behavior is a sufficient indicium of disorderly intoxication under Florida Statute § 856.011. But yelling and chasing people is indicative of a broad range of non-criminal conduct apart from disorderly intoxication. The caller did not convey sufficient information demonstrating that what she was observing was, as the Officers suggest, the manifestation of disorderly intoxication. Without that, the tip is not sufficiently reliable to support a finding of reasonable suspicion.

But even assuming the 911 call did convey sufficiently reliable information that criminal activity was afoot, the Officers' argument still fails because an anonymous tip must be both "reliable in its assertion of illegality" and reliable "in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000) (emphasis added, citation omitted). In Navarette, the tip reliably identified a

suspect: the 911 caller identified a Ford F-150 pickup truck as the car that had run

her off the road and she gave the dispatcher the truck's license plate number.  572

U.S. at 399.  The officers then used the location and license plate number provided

by the caller to identify the exact vehicle the caller had reported.  Id. at 399–400.

The Court held that a contemporaneous tip is reliable when, among other things,

the details and location of the described events turn out to be correct.  Id.

At best, the details and the location of the events described by the 911 caller

here only remotely match what the Officers observed at the scene.  That is not

enough to give rise to a reasonable suspicion.  First, at approximately 12:38 p.m.,

the caller reported that an individual was yelling at and chasing people in the

parking lot.  Nothing in the record before this Court, including the bodycam videos,

suggests that Mr. Jones was yelling at or chasing anyone, either in the parking lot

or inside the convenience store.  To the contrary, he was calmly standing at a

checkout counter attempting to buy something when Officer Robles first saw him.

He was not yelling and did not appear disheveled or out of breath, as if he had just

been chasing someone in the parking lot.  And the convenience store clerk

repeatedly conveyed to the Officers (albeit after the Officers already seized Mr.

Jones) that Mr. Jones "hasn't been aggressive" and "didn't do nothing."  It is

difficult to discern how any of Mr. Jones's behavior gave rise to reasonable suspicion

to stop him when this behavior did not match the tipster's report.

Next, the caller reported that the suspect was a young, "very lean" black male

about six feet tall, wearing a black shirt and green pants.  Mr. Jones is neither "very

27

lean" nor six feet tall.  Mr. Jones has an average, broad-shouldered build.  And he was wearing gray shorts, not green pants.  Apart from being a young-looking black male wearing a black shirt, Mr. Jones did not match the caller's description.  See Dancy v. McGinley, 843 F.3d 93, 109 (2d Cir. 2016) (explaining that "thin, black, and male" is "too vague" in some circumstances to justify a stop of anyone meeting that description).[18]  Unlike the exact match between the 911 caller's description and the truck in Navarette, Mr. Jones was only generically similar to parts of the description given by the 911 caller here.

The Officers place heavy emphasis on the fact that the 911 caller was recounting facts she personally observed.[19]  Personal observation as a basis for reliability is important only when the recounted facts bear a connection or resemblance to the suspect whom the police stop.  Navarette, 572 U.S. at 399–400. Here, the Officers did not identify a person who, based on location and appearance, was likely to be the person accused by the 911 caller.  Accordingly, the Court declines to enter summary judgment on Mr. Jones's unlawful detention claims.

---

[18] The Officers cite Pasiewicz v. Lake County Forest Preserve District, 270 F.3d 520, 524 (7th Cir. 2001), where the court found probable cause to arrest a suspect whose appearance bore only "a fair resemblance" to the description provided by two eyewitnesses.  Pasiewicz involved a known eyewitness report, not an anonymous 911 call.  Id. at 522.  Moreover, the court found that any discrepancies "were more than mitigated by the fact that [an eyewitness] believed she had seen the man again," and provided the suspect's name, address, and phone number to the police based on information she obtained from someone who knew him.  Id. at 522, 52–25.

[19] (Doc. 139 at 5) (citing United States v. Brown, 636 F. App'x 514, 519 (11th Cir. 2016)).

**B.  The Officers are not entitled to summary judgment on Mr. Jones's remaining claims.**

The Officers assert that Mr. Jones's arrest did not violate the Fourth Amendment because, under Florida law, he was guilty of resisting the Officers' attempt to detain him during a <u>Terry</u> stop.  They further argue that their subsequent search of Mr. Jones, which turned up the unlawful drugs, did not violate the Fourth Amendment because it was a legal search incident to a lawful arrest.  As the Court has found that the Officers are not entitled to summary judgment on the question of whether the <u>Terry</u> stop was lawful, these arguments do not provide a basis for finding in favor of the Officers on Mr. Jones's separate Fourth Amendment claims for false arrest and unlawful search.  <u>See</u> <u>Evans v. Stephens</u>, 407 F.3d 1272, 1286 (11th Cir. 2005) (Carnes, J., concurring specially) ("The absence of reasonable suspicion is also 'less than probable cause.'"); <u>see also</u> <u>Olson v. Stewart</u>, 737 F. App'x 478, 483 n.6 (11th Cir. 2018) (noting that under Florida law, suspects have a right to nonviolently resist unlawful arrests).

As to Mr. Jones's excessive force claim, the Officers argue that the use of a taser when a suspect "is resisting by flight" is lawful.  (Doc. 133 at 17–20.)  The Court need not address that argument because the cases cited by the Officers all involve the use of a taser to effectuate a <u>lawful</u> arrest.  The Court has found that the Officers are not entitled to a finding in their favor as a matter of law on the question of the lawfulness of the investigatory stop.  If that stop was not lawful, then tasing and arresting Mr. Jones after he tried to nonviolently disengage from the stop was likewise unlawful.  <u>Stewart</u>, 737 F. App'x at 483 n.6.

Before moving on to qualified immunity, the Court notes that it requested supplementary argument on whether Officer Barlow could also be held liable for the unlawful <u>Terry</u> stop, assuming that Mr. Jones had been seized by Officer Robles prior to Officer Barlow's arrival.  (Doc. 150 at 2.)  The parties did not meaningfully address this question during their argument.  But the Eleventh Circuit has recognized a cause of action against an officer who participated in an unlawful seizure. [20]  <u>See</u> <u>Jones v. Cannon</u>, 174 F.3d 1271, 1284 (11th Cir. 1999) ("[T]he record presents an issue of fact regarding whether [the officer] was sufficiently involved in this initial warrantless arrest to be liable for false arrest . . . ."); <u>see also</u> <u>Stallworth v. Hurst</u>, No. 2:18-cv-1005-ALB-SRW, 2019 WL 5070196, at *3 (M.D. Ala. Oct. 8, 2019) ("Instead of establishing a duty to intervene in the context of unlawful arrest, the Eleventh Circuit has recognized a 'negligent involvement in unlawful arrest' tort that exposes only those to liability who take part in causing unlawful arrests to occur and possess actual knowledge that there is no constitutional basis for them.").

---

[20] Other circuits have similarly held that a backup officer who integrally participates in an unlawful search or seizure is liable under section 1983, even if that officer's conduct alone is not a constitutional violation.  <u>See</u> <u>Melear v. Spears</u>, 862 F.2d 1177, 1186 (5th Cir. 1989) ("Because the jury could properly have found that the search was unconstitutional, it was also justified in finding both officers liable for their integral participation in the violation."); <u>Bravo v. City of Santa Maria</u>, 665 F.3d 1076, 1089–90 (9th Cir. 2011) ("Section 1983 liability extends to those who perform functions 'integral' to an unlawful search, even if their individual actions do not themselves rise to the level of a constitutional violation."); <u>Russo v. Massullo</u>, 927 F.2d 605 (6th Cir. 1991) (per curiam) ("The defendants attempt to evade liability by pointing to each other.  However, their arguments are unpersuasive in light of cases holding that all members of the team are liable where there is a team effort or where the members were an integral part of an unlawful search and seizure.").

On this record—and noting the absence of any meaningful argument to the contrary—the Court finds that there is at least a question of fact as to whether Officer Barlow knew that there was no constitutional basis for the arrest.  Officer Barlow apparently received the same anonymous tip that Officer Robles did and knew that the tip was the reason that Mr. Jones was being detained.  (Doc. 137-4, Tr. 1, at 18:3–5, 21:13–21.)  That tip, as discussed above, did not contain sufficient indicia of reliability to detain Mr. Jones.  Officer Barlow could not recall when he had formulated reasonable suspicion that Mr. Jones was committing a crime.  (Id. at 21:25–22:6).  He could not even articulate what "crime" Mr. Jones had been committing.  (Id., Tr. 2, at 92:22–95:8.)

Granted, the situation Officer Barlow saw when he entered the store was more tense than the one Officer Robles did.  But that does not change the fact that Mr. Jones did not match the description of the suspect given by the anonymous tipster—something both Officers could have easily observed.  Accordingly, while the seizure began before Officer Barlow arrived at the scene, the Court will likewise deny summary judgment to Officer Barlow on the unlawful detention claim.

## II.   Whether the Officers are entitled to qualified immunity.[21]

As their last argument, the Officers contend that, even if Mr. Jones could prove a constitutional violation, they are entitled to qualified immunity.

---

[21] The Court addresses the Officers' qualified immunity collectively because, in their papers, they do too.  At no point do the Officers entertain the possibility that their immunity is asymmetrical—i.e., that Officer Barlow may have immunity for certain conduct, but Officer Robles does not, and vice versa.  Instead, the Officers vigorously contend that their entire course of action—from start to finish—

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Courts utilize a two-part framework to evaluate qualified immunity claims.  One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010) (citing Hope v. Pelzer, 536 U.S. 730, 736 (2002)).  "If the facts . . . show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.'" Id. (citation omitted).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate . . . ." Id. (citing Pearson v. Callahan, 555 U.S. 223, 241 (2009)).

There is no dispute that the Officers were performing discretionary functions. As such, it is Mr. Jones's burden to show that the Officers are not entitled to qualified immunity by demonstrating that both parts of the test are satisfied.  See Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012).

---

was legal.  While district courts are empowered to sometimes raise qualified immunity issues sua sponte, they are not obligated to do so.  And doing so here would amount to re-briefing the Officers' entire summary judgment motion.

### A.   Mr. Jones has established a constitutional violation under the first step.

Through its analysis addressing the lack of reasonable suspicion supporting Mr. Jones's seizure, the Court has essentially resolved the first part of the qualified immunity analysis in the affirmative; Mr. Jones's allegations, if true, constitute a violation of his Fourth Amendment rights.  (See infra pp. 19–24.)  The Officers' next argument is that "in the context of qualified immunity, arguable probable cause is all that is needed for a detention."  (Doc. 133 at 22) (emphasis added) (citing Jones, 174 F.3d at 1283 n.3 (11th Cir. 1999)).  Putting aside for a moment the fact that reasonable suspicion (not probable cause) is at issue here, there are two problems with the Officers' position.

First, the Officers include this argument within the "first part" of the qualified immunity framework.  Yet the Eleventh Circuit has made clear that an arguable-probable-cause analysis applies at the second step of a qualified immunity analysis, not the first (i.e., whether a constitutional violation has occurred).  Bailey v. Swindell, 940 F.3d 1295, 1300 n.5 (11th Cir. 2019).  Thus, the Officers' motion for summary judgment does not appear to contain any argument on the first step of the analysis beyond what the Court has already addressed—and rejected.

Second, the Officers' counsel conceded at the summary judgment hearing that there was "obviously . . . no probable cause" to effectuate any kind of arrest, which is why counsel's argument—and this Order—focused entirely on the lesser threshold of reasonable suspicion for investigative stops.  (Doc. 158 at 19:5 (emphasis added).)  "Arguable probable cause" only exists if hypothetical,

reasonable law enforcement officers who possessed the same knowledge as the Officers in this case could have believed that probable cause existed—in other words, if they could have made the same mistake.  See Von Stein v. Brescher, 904 F.2d 572, 579–80 (11th Cir. 1990).  If the lack of probable cause is especially "obvious" in this case, then the Court has difficulty understanding how any kind of "arguable" probable cause could possibly afford the Officers qualified immunity in this case.  Cf. Olson v. Stewart, 737 F. App'x 478, 481 n.4 (11th Cir. 2018) (explaining that theories of "arguable probable cause" can be waived).

The Officers' concession at oral argument, without more, is arguably enough for the Court to deny them qualified immunity altogether.  After the Officers conclude what they believe to be the "first" prong of the qualified immunity analysis, there is virtually no argument as to the second prong.  Instead, they simply fall back on their argument that no constitutional violation exists in the first place.  (Doc. 133 at 23–25.)  The Court has already addressed this point at length, and there is no need to further belabor it—if the only question is whether a constitutional violation, the Court has already explained that the answer is yes.

## B.   The Officers cannot satisfy the second step of qualified immunity.

Even if the Court were to very charitably assume that the Officers meant to invoke arguable reasonable suspicion, Jackson, 206 F.3d at 1166, as opposed to arguable probable cause, the Court finds no basis to grant the Officers qualified immunity.  In the context of arguable reasonable suspicion, as opposed to a more traditional qualified immunity analysis, the Eleventh Circuit has recently explained

that: (a) the Court must ask if "a <u>reasonable jury</u> could find" that no reasonable officer would have made the same mistake on the question of reasonable suspicion, and (b) the Court must view the facts relevant to arguable reasonable suspicion in the light most favorable to the plaintiff.  <u>Young v. Brady</u>, 793 F. App'x 905, 908, 913 (11th Cir. 2019) (per curiam) (emphasis added).  Considering the pre-seizure facts, a reasonable jury could find that no reasonable officer—possessing the same knowledge as the Officers in this case—would have believed that he had reasonable suspicion to detain Mr. Jones.  The anonymous caller's description of the person supposedly yelling at and chasing people in the parking lot was not corroborated by anything the Officers observed.  Instead, Officer Robles' bodycam video shows Mr. Jones, both calm and composed, standing at the convenience store counter.

Specifically, the Officers received a tip that a man was yelling at and chasing people in the parking lot of a 7-Eleven store.  When Officer Robles arrived, he saw Mr. Jones making a purchase at the checkout counter.  Mr. Jones matched the description in only a superficial sense—he was a black male wearing a black shirt. Officer Robles walked up to Mr. Jones and asked him to come outside.  Mr. Jones refused the request and appeared to attempt to shake Officer Robles's hand.  Officer Robles then changed his tone, cornered Mr. Jones, and ordered him out of the store. In short order, Officer Barlow arrived and did the same.  A reasonable officer in Officer Robles's position would have known, based on the case law cited earlier, that the anonymous tip by itself did not establish reasonable suspicion to stop Mr. Jones in the first instance—especially given the Officers' reliance on generalized

similarities between the 911 caller's description of the suspect and Mr. Jones (a black man wearing a black shirt) and no other corroborating details (such as the man's location or conduct consistent with the caller's report, or Mr. Jones's build and appearance).  When a person is detained based on "the flimsiest of information conveyed by a telephone call," it is clear that "the existence of neither reasonable suspicion nor 'arguable reasonable suspicion' has been shown."  Cortez v. McCauley, 478 F.3d 1108, 1118, 1123 (10th Cir. 2007) (en banc).

The Officers did not ask Mr. Jones if he was under the influence of drugs or if he had bothered anyone outside.  They did not ask the cashier if a customer had been accosted outside (even though the cashier repeatedly tried to tell the Officers that Mr. Jones was not bothering anyone and did not do anything).  They did not ask any individuals in the parking lot (who were clearly there) if they had seen anything suspicious.  At bottom, at the time of the incident the law was sufficiently clear such that no reasonable officer in the Officers' shoes would have concluded that he had reasonable suspicion (or even arguable reasonable suspicion) to conduct an investigatory stop of Mr. Jones for disorderly intoxication after observing that Mr. Jones: (1) did not match the caller's physical description, and (2) was acting in a manner precisely opposite to what the caller described.  As such, Mr. Jones has sufficiently demonstrated that the Officers are not entitled to qualified immunity.[22]

---

[22] In one sentence at the end of their motion, the Officers argue that Mr. Jones "has not . . . produced a clearly establish[ed] line of precedent that would show the [O]fficers' actions were unconstitutional."  (Doc. 133 at 24.)  But the Eleventh Circuit has cautioned that "[e]xact factual identity with a previously decided case is not required [if] the unlawfulness of the conduct [is] apparent from

<u>CONCLUSION</u>

A word of caution: The Court is mindful of the danger law enforcement officers face while investigating citizens' reports.  In no way does this Court discount that danger.  The Court's conclusions here are based on legal standards, which require this Court to view the facts in the light most favorable to Mr. Jones.  The Officers' motion for summary judgment (Doc. 133) is therefore **DENIED.**[23]

**ORDERED** in Fort Myers, Florida, on July 26, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

---

pre-existing law." <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011).  The critical inquiry is whether the Officers had "'fair warning' that [their] conduct violated the Fourth Amendment." <u>Id.</u> (citing <u>McClish v. Nugent</u>, 483 F.3d 1231, 1248 (11th Cir. 2007)).  And the law is, of course, clear that a <u>Terry</u> stop without reasonable suspicion violates the Fourth Amendment.  <u>Terry</u>, 392 U.S. at 30–31.

[23] Furthermore, the Officers' counsel who appeared at the summary judgment hearing will be, by separate order and at the conclusion of this litigation, ordered to appear before the Middle District of Florida's Grievance Committee (Fort Myers) for, among other things, the inappropriate comments he made during the hearing on summary judgment.  To be clear, that attorney's brazen representations and actions were not, in any way, attributed to the Officers.  The Court decided the Officers' motion for summary judgment by strictly adhering to the applicable law.